[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Ford,* Slip Opinion No. 2019-Ohio-4539.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-4539

THE STATE OF OHIO, APPELLEE, *v.* FORD, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Ford,* Slip Opinion No. 2019-Ohio-4539.]

*Criminal Law—Aggravated murder—Conviction affirmed—Death sentence vacated and cause remanded to trial court to properly determine whether defendant is intellectually disabled after considering the following three core elements: (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—i.e., a score of roughly 70 or lower when adjusted for the standard error of measurement), (2) significant adaptive deficits in any of the three adaptive-skill sets (conceptual, social, and practical), and (3) the onset of these deficits while the defendant was a minor.*

(No. 2015-1309—Submitted January 8, 2019—Decided November 7, 2019.)

APPEAL from the Court of Common Pleas of Summit County, No. 13-04-1008(A).

————————————

**STEWART, J.**

{¶ 1} This is an appeal of right from aggravated-murder convictions and a death sentence. A Summit County Common Pleas Court jury found appellant, Shawn Ford Jr., guilty of the aggravated murders of Jeffrey and Margaret Schobert and unanimously recommended a death sentence for Margaret's murder. The trial court accepted the recommendation and sentenced Ford accordingly.

{¶ 2} We affirm Ford's convictions. However, we remand this case to the trial court to evaluate whether Ford is intellectually disabled in accordance with the criteria set forth in this opinion.

## I. Trial Evidence

{¶ 3} Evidence introduced at trial showed that on March 23, 2013, Ford stabbed his girlfriend, Chelsea Schobert, after hitting her in the head with a brick. While Chelsea was in the hospital, her parents, Jeffrey and Margaret, were concerned for Chelsea's safety and did not permit Ford to visit her. On April 2, Ford broke into the Schoberts' home with Jamall Vaughn. Jeffrey was home and in bed. Margaret was at the hospital with Chelsea. Ford killed Jeffrey and then waited for Margaret to return home from the hospital. Margaret was killed when she came home. Ford stole Jeffrey's car and other valuables from the Schoberts' home.

### A. Chelsea's Assault

{¶ 4} Chelsea started dating Ford in August or September 2012. On Friday, March 22, 2013, Chelsea celebrated her 18th birthday with Ford, Zachary Keys, and Joshua Greathouse at Zachary's Akron residence. They started drinking around 11:00 p.m., and everyone became highly intoxicated.

{¶ 5} At some point, Ford and Chelsea went to a bedroom. According to Chelsea, Ford wanted to have sex, but she was not feeling well and asked him to wait. Ford pushed her onto the bed. Chelsea said "no" and got up. She told Ford, "I hate you." Ford then hit Chelsea in the head.

{¶ 6} Zachary and Joshua were in the living room watching TV when Ford and Chelsea went into the bedroom. After 10 to 15 minutes, Zachary went to the bedroom after hearing a "thud." He found Chelsea halfway off the bed with a gashed head. A brick with blood on it was nearby. Zachary asked Ford, "What the hell is going on here?" Ford left the bedroom. He returned with a knife and stabbed Chelsea in the neck and back.

{¶ 7} Zachary stopped Ford from stabbing Chelsea again and told him to take her to the hospital. They took Chelsea to the car, and Ford drove her to the hospital. Chelsea suffered a spinal injury that left lasting effects.

### 1. Cover-up of the Assault

{¶ 8} On Saturday, March 23, Ford told Zachary to tell the police that Chelsea had been assaulted by some guys at a party in Kent. He also told Joshua, "I want to make sure that you don't talk about this."

{¶ 9} On March 25, Akron Detectives Bertina King and Richard Morrison went to the hospital to speak to Chelsea. Chelsea indicated that she did not know her attacker. The detectives also learned that there was a Global Positioning System ("GPS") tracker on Chelsea's car. The GPS showed that the car had been at Zachary's residence on the night of March 22 and not in Kent.

{¶ 10} Later on March 25, the detectives conducted a recorded interview with Ford. Ford stated that Chelsea indicated she had been attacked at a party in Kent. After being told about the GPS tracker, Ford told police that they were at Zachary's house when Chelsea was attacked. Ford claimed that they were assaulted by someone Zachary owed money to and that the person hit Chelsea with a gun when she started cursing at him.

{¶ 11} Ford, Zachary, and Chelsea each identified the same person, a man known as Ruiz, in a photo array. On March 27, the police arrested Ruiz and charged him with Chelsea's assault. Ruiz denied his involvement and provided a good alibi. The police later determined that he was telling the truth.

2. Ford Prohibited from Visiting Chelsea at the Hospital

{¶ 12} Chelsea's room was in a secured part of Akron Children's Hospital, and she did not have a phone in her room.

{¶ 13} Even though Ruiz had been arrested, the Schoberts did not permit Ford to visit Chelsea in the hospital. The Schoberts and law enforcement thought this was best for her safety.

*B. The Discovery of Jeffrey and Margaret Schobert*

{¶ 14} Around 8:00 or 9:00 p.m. on April 1, Jeffrey went home from the hospital while Margaret remained with Chelsea. Margaret left the hospital and went home at about 6:00 a.m. on April 2. Around 1:30 p.m. on April 2, Nickolas Gerring, a building contractor working on the Schoberts' home, found Jeffrey's and Margaret's bodies in their bedroom. Gerring called 9-1-1. A New Franklin police officer responding to the scene found Jeffrey on the bed and Margaret on the floor next to it. Both of them had multiple, massive head wounds. A sledgehammer was lying on the bed next to Jeffrey. Jeffrey's car was missing.

*C. The Murder Investigation Begins*

{¶ 15} George Staley from the Crime Scene Unit at the Ohio Bureau of Criminal Investigation ("BCI") processed the crime scene. He found reddish stains—which later yielded positive results in a presumptive blood test—in the ground level of the house, near the doorway leading to the room between the kitchen and the garage.

{¶ 16} Staley collected a knife that was lying on a living-room chair and a piece of what appeared to be part of a surgical glove that had a reddish stain on it. Other reddish stains were found on pieces of paper inside Margaret's purse, which was on the dining-room table.

{¶ 17} Police found blood spatter on the master-bedroom ceiling and on the dresser near the bed. The sledgehammer and a small piece of plastic on the bed were also collected.

{¶ 18} At the outset of the investigation, Detective Michael Hitchings, the lead investigator, learned that Chelsea had been attacked and that the Schoberts had been keeping Ford from seeing her in the hospital.

{¶ 19} On the evening of April 2, Hitchings questioned Ford. Hitchings told Ford that the Schoberts had been killed. According to Hitchings, Ford reacted to the news with "a blank look." Ford said he was not involved and did not know anything about the murders. But the police collected Ford's Air Jordan shoes, because there appeared to be "some spots" on them. Ford was then taken to the Portage County jail where he was held on a warrant for lying about Chelsea's assault.

### 1. Jeffrey's Car and Other Evidence Found

{¶ 20} On April 3, Hitchings learned that Ford had provided George Beech, a fellow inmate, with information about the murders, which Beech had passed on to the Portage County Sheriff. As a result of that information, Jeffrey's car was found in Akron. Police officers searched the area around the car and found gloves, a knife, and a knit hat inside the storm drain in front of a home on Fried Street.

{¶ 21} Hitchings spoke to a woman who lived at the house. He learned that her son was Ford's friend. She let them search the house. The police encountered Jamall Vaughn in an upstairs bedroom. Hitchings also found a ceramic watch, later identified as Margaret's, on the bedroom floor.

### 2. Ford Admits Killing the Schoberts

{¶ 22} On the afternoon of April 3, Hitchings interviewed Ford again. Ford continued to deny involvement in the murders. Hitchings testified that Ford claimed he walked halfway there with Zachary and someone named Malik but turned around. Hitchings told Ford that the Schoberts' and Chelsea's blood was found on his Air Jordan shoes. Ford claimed that he had loaned his shoes to Zachary and then later got them back. According to Hitchings, Ford then admitted being at the Schoberts "one time and it was for the dad" but said he got upset and

left. Hitchings testified that Ford then said he was there for part of it but blamed the murders on Zachary and Malik, because they had the weapons.

{¶ 23} That evening, Hitchings interviewed Vaughn. Following that interview, the police recovered cloth and latex gloves from a sewer drain on City View Avenue.

{¶ 24} On April 4, Hitchings interviewed Ford again. He told Ford that Vaughn had been interviewed and discussed the evidence against Ford. According to Hitchings, Ford stated that it was Vaughn's idea to do a "lick" at the Schoberts and that they walked from Akron to the Schoberts' house. Hitchings testified that Ford blamed Vaughn for the murders at first. However, as the interview continued, Ford said that he was the only one that used the sledgehammer on Jeffrey and Margaret. But he said that Vaughn stabbed Jeffrey in the back. Ford also said that they took Jeffrey's car.

{¶ 25} On the evening of April 5, Ford made a recorded phone call from the Summit County jail to his brother. Hitchings testified that Ford discussed the murders during that call and indicated that he and Vaughn were the only two individuals involved in committing them.

3. Ford's Statements to Heather Greathouse and Other Evidence

{¶ 26} Heather Greathouse lived at her mother's home in Akron with her brother, her boyfriend, and Ford. At trial, Heather testified that on the night before the murders, Ford told her he was going to "hit a lick," which she said meant to break into a house and rob it. The next day, she found a pair of bloody pants on the floor and told her boyfriend to burn them. She testified that Ford brought back two rings and some money. Heather's aunt threw one of the rings in a dumpster at the Family Dollar store. The police later recovered the burned jeans from Heather's home and found the ring in the dumpster.

{¶ 27} Heather also testified that Ford admitted stabbing Chelsea and hitting her in the head with a brick. Ford said he did it because "she wasn't paying

attention to him." According to Heather, Ford also said he would have killed Chelsea if Zachary had not stopped him.

### 4. Autopsy Results

**{¶ 28}** Dr. Dorothy Dean, deputy medical examiner for Summit County, conducted the autopsies of Jeffrey and Margaret. She concluded that Jeffrey died from numerous blunt impacts to the head, having been struck at least 14 times. He was also stabbed three times, but none of those wounds were life-threatening. Margaret died from blunt impacts to the head, having been struck at least 19 times. Both victims' injuries were consistent with being hit by a sledgehammer.

### 5. DNA and Forensic Evidence

**{¶ 29}** Martin Lewis, a forensic scientist at BCI, testified that the small piece of plastic found on the Schoberts' bed fit perfectly into the handle of the knife recovered from the storm drain on Fried Street. Lewis concluded that the plastic was at one time a piece of the larger knife handle.

**{¶ 30}** Lindsey Pruneski, a forensic scientist at BCI, testified that stains on the sledgehammer, Ford's shoes, the cloth and latex gloves found in the City View Avenue drain, and the knife and stocking cap found in the Fried Street drain tested positive in a presumptive blood test. A stain on the burned jeans also tested positive.

**{¶ 31}** A forensic scientist in the DNA section at BCI stated that the DNA profiles from stains on Ford's right shoe, the gloves found in the City View Avenue drain, the stocking cap, the knife blade and handle found in the Fried Street drain, and the burnt jeans were consistent with Jeffrey's DNA profile. The forensic scientist determined that the expected frequency of occurrence of that DNA profile was 1 in 103.3 sextillion unrelated individuals.

**{¶ 32}** The forensic scientist stated that the DNA profile from one of the stains on Ford's left shoe was a mixture. The major DNA profile was consistent with Margaret's, and the minor DNA profile was consistent with Ford's. The

expected frequency of occurrence of Margaret's DNA profile on Ford's shoe was 1 in 3.163 quadrillion unrelated individuals.

{¶ 33} The DNA profile on another stain on Ford's left shoe was also a mixture. The major profile was consistent with Chelsea's. The partial minor profile was consistent with Ford's. The expected frequency of occurrence of Chelsea's profile on Ford's shoe was 1 in 1.712 quintillion unrelated individuals.

{¶ 34} BCI's forensic scientist stated that the DNA profiles from the stocking cap and the waistband of the burnt jeans were both mixtures consistent with contributions from Ford and two unknown individuals. The DNA profile on the outside of a light purple latex glove was also a mixture. The major profile was consistent with Ford. The expected frequency of occurrence of Ford's DNA profile on the glove was 1 in 3.134 quintillion unrelated individuals.

{¶ 35} Finally, the forensic scientist determined that Vaughn could not be excluded as the major source of DNA obtained from inside another latex glove. The expected frequency of occurrence of Vaughn's partial major DNA profile inside the glove was 1 in 124.2 quintillion unrelated individuals.

## II. Procedural History

{¶ 36} The state charged Ford with five counts of aggravated murder. In Count 1, he was charged with the aggravated murder of Jeffrey with prior calculation and design. In Count 2, he was charged with the aggravated murder of Jeffrey while committing an aggravated robbery. In Count 4, he was charged with the aggravated murder of Margaret with prior calculation and design, and in Count 5, with the aggravated murder of Margaret while committing an aggravated robbery. In Count 3, he was charged with the aggravated murder of Jeffrey or Margaret while committing aggravated burglary.

{¶ 37} Each aggravated-murder count contained three death-penalty specifications: (1) committing or attempting to commit aggravated robbery as the principal offender in the commission of the aggravated murder or, if not the

principal offender, committing the aggravated murder with prior calculation and design, R.C. 2929.04(A)(7), (2) committing or attempting to commit aggravated burglary as the principal offender in the commission of the aggravated murder or, if not the principal offender, committing the aggravated murder with prior calculation and design, R.C. 2929.04(A)(7), and (3) a course of conduct involving multiple murders, R.C. 2929.04(A)(5).

{¶ 38} In Counts 6 through 11, Ford was also charged with aggravated robbery, aggravated burglary, grand theft of a motor vehicle, petty theft, and the felonious assault of Chelsea.

{¶ 39} Ford pled not guilty to all charges. The jury found Ford guilty of all counts and specifications. He was found guilty of the felony-murder specifications as to Counts 1, 2, 3, and 5 with a determination that he was the principal offender. And he was found guilty of the felony-murder specifications as to Count 4 with a determination that he committed the aggravated murder of Margaret with prior calculation and design.

{¶ 40} The trial court merged for sentencing the aggravated-murder counts for Jeffrey's death, and the jury returned a verdict of life imprisonment without the possibility of parole on Count 2. The trial court likewise merged for sentencing the aggravated-murder counts for Margaret's death, and the jury returned a death sentence on Count 4. The trial judge sentenced Ford accordingly. Counts 6 through 10 were merged with the aggravated-murder counts. Ford was sentenced on Count 11 to eight years for the felonious assault of Chelsea.

{¶ 41} Ford appeals his convictions and sentence and raises 23 propositions of law. We will address the issues in the approximate order that they arose during trial; however, we will first address the issue of whether the trial court properly determined that Ford is not intellectually disabled.

### III. Intellectual Disability

**{¶ 42}** In proposition of law No. III, Ford argues that the trial court erred in ruling that he is not intellectually disabled. This claim has merit, and we remand the matter to the trial court for further review to determine whether Ford is intellectually disabled.

*A. Standards for Assessing Intellectual Disability*

1. *Atkins* and *Lott*

**{¶ 43}** In *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Supreme Court of the United States held that the execution of intellectually disabled individuals violates the ban on cruel and unusual punishment found in the Eighth Amendment to the United States Constitution.

**{¶ 44}** *Atkins* defined "mental retardation," i.e. "intellectual disability,"[1] by reference to two clinical definitions: one from the American Association on Mental Retardation's *Mental Retardation: Definition, Classification, and Systems of Support* (9th Ed.1992) and the second from the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th Ed.2000). But the Supreme Court left to the states " 'the task of developing appropriate ways to enforce' " the restriction on executing the intellectually disabled. *Atkins* at 317, quoting *Ford v. Wainwright*, 477 U.S. 399, 416, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

**{¶ 45}** In *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, we set forth a definition of intellectual disability for courts to follow. *Lott* required "(1) significantly subaverage intellectual functioning, (2) significant limitations in *two or more* adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18." (Emphasis added.) *Id*. at ¶ 12.

---

1. The phrase "intellectual disability" will be used throughout this opinion including in place of the term "mental retardation."

*Lott* also held that there is "a rebuttable presumption" that a defendant is not intellectually disabled if "his or her [intelligence quotient ("IQ")] is above 70." *Id.*

## 2. Diagnostic Standards

{¶ 46} In 2010, the American Association on Intellectual and Developmental Disabilities ("AAIDD") updated its medical diagnostic standards for defining intellectual disability in the 11th edition of its clinical manual, *Intellectual Disability: Definition, Classification, and Systems of Supports* ("*AAIDD-11*"). In 2013, the American Psychiatric Association updated its definition of intellectual disability in the *Diagnostic and Statistical Manual of Mental Disorders* (5th Ed.2013) ("*DSM-5*"). Both updated definitions identified three core elements: (1) "intellectual-functioning deficits (indicated by an IQ score 'approximately two standard deviations below the mean,'—*i.e.*, a score of roughly 70—adjusted for 'the standard error of measurement,' *AAIDD-11*, at 27)," *Moore v. Texas*, __ U.S. __, 137 S.Ct. 1039, 1045, 197 L.Ed.2d 416 (2017) ("*Moore I*"), (2) significant adaptive-skill deficits in *one or more* activities of daily life, and (3) the onset of these deficits before the age of 18. *AAIDD-11* at 27, *DSM-5* at 33; *see Hall v. Florida*, 572 U.S. 701, 710, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014).

{¶ 47} In *Hall* and *Moore I*, the United States Supreme Court applied the updated medical diagnostic standards in striking down state-court decisions on intellectual disability.

## 3. *Hall v. Florida*

{¶ 48} In *Hall*, the Supreme Court applied *Atkins* to invalidate a Florida law that precluded the presentation of additional evidence of intellectual disability when the offender scored above 70 on IQ tests. *Hall* at 723-724. *Hall* held that courts must consider the standard error of measurement ("SEM"), *id.* at 723, which reflects the imprecise nature of the IQ test and the fact that an individual's IQ score may fluctuate for a variety of reasons, *id.* at 712-713. The Supreme Court instructed that states must "understand that an IQ test score represents a range rather than a

fixed number." *Id*. at 723. Therefore, "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id*.

### 4. *Moore v. Texas*

**{¶ 49}** In *Moore I*, __ U.S. at ___, 137 S.Ct. at 1053, 197 L.Ed.2d 416, the Supreme Court struck down a Texas Court of Criminal Appeals decision that relied on an outdated definition in assessing whether the defendant was intellectually disabled.

**{¶ 50}** Moore claimed that he was intellectually disabled and therefore ineligible for the death penalty under the Eighth Amendment. *Id*. at __, 137 S.Ct. at 1045. A state habeas court agreed with him, applying a definition of "intellectual disability" based on then-current medical standards, including those for evaluating both IQ scores and adaptive-functioning measures. *Id*. at __, 137 S.Ct. at 1046. But the Texas Court of Criminal Appeals reversed, holding that Moore failed to prove significantly subaverage intellectual functioning because he had achieved IQ test scores of 74 and 78. Id. at __, 137 S.Ct. at 1047. Further, the Texas court concluded, Moore failed to prove " 'significant and related limitations in adaptive functioning' " based on additional restrictions imposed by Texas case law. *Id*.

**{¶ 51}** The United States Supreme Court vacated the judgment and remanded the case. *Moore I* held that the Texas high court had "fastened" its intellectual-disability determination to an outdated definition of intellectual disability adopted in that state's earlier court rulings and that this archaic definition "pervasively infected" the state-court analysis such that the decision of the state court could not stand. *Id*. at __, 137 S.Ct. at 1053. *Moore I* explained that the Texas court's analysis of Moore's IQ scores was "irreconcilable with *Hall*" because it failed to account for the SEM. *Id.* at ___, 137 S.Ct. at 1049. Moore had a score of 74 on one test, but when adjusted for the SEM, he had a range of 69 to 79. *Id*.

This meant that *the lower end of the range* fell below 70, and therefore, the Texas court was required under *Hall* to consider Moore's adaptive functioning. *Id*.

{¶ 52} Then, addressing the Texas court's rejection of adaptive-functioning criteria, the Supreme Court expanded on *Hall's* analysis, noting: "By rejecting the habeas court's application of medical guidance and clinging to the standard it laid out in [an earlier case], the [Texas court] *failed adequately to inform itself of the 'medical community's diagnostic framework * * *.' "* (Emphasis added.) *Moore I,* __ U.S. at __, 137 S.Ct. at 1053, 197 L.Ed.2d 416, quoting *Hall*, 572 U.S. at 703, 134 S.Ct. 1986, 188 L.Ed.2d 1007. The Supreme Court remanded Moore's case, and the Texas court was required to reconsider its decision in light of the new framework. *Id*.

{¶ 53} In *Moore I*, the court noted that the *DSM-5* stated that "deficits in *only one* of the three adaptive-skills domains suffice to show adaptive deficits." (Emphasis added.) *Id*. at ___, 137 S.Ct. at 1050; *see DSM-5* at 33, 38. The court also noted that "[i]n determining the significance of adaptive deficits, clinicians look to whether an individual's adaptive performance falls two or more standard deviations below the mean *in any of the three* adaptive skill sets (conceptual, social, and practical)." (Emphasis added.) *Id*. at ___, 137 S.Ct. at 1046; *see AAIDD-11* at 43.

{¶ 54} On remand, the Texas Court of Criminal Appeals reconsidered its decision that Moore did not have an intellectual disability but reached the same conclusion. The Supreme Court again reviewed the state court's decision and reversed. *See Moore v. Texas*, __ U.S. __, 139 S.Ct. 666, __ L.Ed.2d __ (2019) ("*Moore II*").

{¶ 55} The Supreme Court emphasized that "the court of appeals again relied less upon adaptive *deficits* to which the trial court had referred than upon Moore's apparent adaptive *strengths*." (Emphasis sic.) *Id*. at __, 139 S.Ct. at 670. The Supreme Court faulted the state court for (1) emphasizing Moore's capacity to

communicate, read, and write based in part on pro se papers Moore had filed in court without determining that Moore wrote the papers on his own, (2) relying upon adaptive improvements Moore made in prison, (3) concluding that Moore failed to show that his deficient social behavior was related to his mental disabilities rather than emotional problems, and (4) relying on " 'lay stereotypes of the intellectually disabled.' " *Id*. at ___, 139 S.Ct. at 670-672, quoting *Moore I*, __ U.S. __, 137 S.Ct. at 1052, 197 L.Ed.2d 416. Rather than remanding Moore's case, the Supreme Court found that on the basis of the trial-court record, Moore had established that he is a person with intellectual disability. *Id*. at ___, 139 S.Ct. at 672.

*B. Relevant Factual Background*

1. Pretrial Evaluations

**{¶ 56}** Before trial, Dr. Robert Byrnes, a psychologist, examined Ford to determine whether he was competent to stand trial and whether he was intellectually disabled.

**{¶ 57}** In his report, Dr. Byrnes stated that no records suggested that Ford has ever been diagnosed as intellectually disabled. In the summer of 2013, he administered the Wechsler Abbreviated Scale of Intelligence ("WASI"), and the results showed that Ford had a full-scale IQ score of 64. But Dr. Byrnes stated that "[t]hese results probably underestimate Mr. Ford's intellectual ability because of variable attention and impulsive behavior during the testing." Dr. Byrnes concluded that Ford was not intellectually disabled.

**{¶ 58}** Dr. Arcangela Wood, a psychologist and director of a state-certified forensic center, also conducted a pretrial evaluation of Ford. She determined that Ford was sane at the time of the crimes. Dr. Wood administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"). Ford scored a full-scale IQ of 80 (95 percent confidence interval ["CI"] = 76-84), which placed his overall intellectual functioning in the "low average range of intelligence."

### 2. Mitigation Testimony as to Ford's Mental State

**{¶ 59}** The defense hired Dr. Joy Stankowski, a psychiatrist, as a mitigation specialist. She interviewed Ford and examined his prior IQ test results but did not administer any new ones or determine whether he was intellectually disabled. During mitigation, she testified that "Shawn's IQ over the years tested to be anywhere between 62 and 80."

**{¶ 60}** Following Dr. Stankowski's mitigation testimony, defense counsel moved to dismiss the death specifications because Ford's IQ scores ranged between 62 and 80. The trial court overruled the motion, but held a hearing to determine whether Ford was intellectually disabled, *see Atkins*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, after the jury returned the death verdict.

### 3. *Atkins* Hearing

**{¶ 61}** In preparation for the *Atkins* hearing, three experts evaluated whether Ford was intellectually disabled. Dr. Katie Connell, a forensic psychologist, was the court's expert; Dr. James Karpawich, a clinical psychologist, was the defense expert; and Dr. Sylvia O'Bradovich, a forensic psychologist, was the state's expert.

#### a. Dr. Connell's evaluation

**{¶ 62}** Dr. Connell conducted a detailed evaluation of Ford's school records. She reported that an evaluation conducted when Ford was six years old indicated that he did "not meet the mental retardation criteria." The childhood evaluation attributed Ford's learning difficulties to linguistic factors, found that he had a specific learning disability, and identified a speech or language impairment.

**{¶ 63}** Dr. Connell reviewed Ford's scores on five IQ tests: (1) Mental Processing Composite score of 78 on the Kaufman Assessment Battery for Children ("K-ABC") in 2001 at age 6 or 7, (2) full-scale IQ score of 62 on the Wechsler Intelligence Scale for Children, Third Edition ("WISC-III") in 2003 at age 9, (3) IQ composite score of 75 on the Kaufman Brief Intelligence Test, Second Edition

("K-BIT2") in 2006 at age 12, (4) full-scale IQ score of 64 on the WASI in 2013 at age 18, and (5) full-scale IQ score of 80 on the WAIS-IV in 2013 at age 19.[2]

{¶ 64} Dr. Connell did not deem the IQ score of 62 to be a reliable assessment of Ford's intellectual functioning because the evaluator stated that he was extremely fidgety and distracted at the time of the test. Dr. Connell also discounted the IQ score of 64 because Dr. Byrnes had reported that "these results probably underestimate[d]" Ford's intellectual ability. Dr. Connell also noted that Ford told her that during previous testing with Dr. Byrnes, "I don't know if I tried or not. Very possible I didn't try."

{¶ 65} Dr. Connell did not conduct additional IQ testing. She stated, "Available records provided three prior IQ test results, and *even when considering measurement error* and that one was an abbreviated measure, all were clearly above the range of scores found in individuals diagnosed with an intellectual disability." (Emphasis added.)

{¶ 66} Dr. Connell also discussed the "Flynn Effect." She explained that "Flynn reported that mean IQ increases about .33 points per year and some researchers have suggested that any obtained IQ score should be adjusted [down] .33 points for each year the test was administered after the standardization was completed." She stated that there continues to be debate about the Flynn Effect. Dr. Connell stated, "The Flynn effect would have the most relevance in terms of the K-ABC as this test was published in 1983 and administered to Mr. Ford in 2001. If a Flynn adjustment was applied to Mr. Ford's prior K-ABC test results, his mental processing composite score would be approximately 72." She added, "The Flynn effect would have little impact on his K-BIT2 score as this was published in 2004 and administered to Mr. Ford in 2006 or on his WAIS-IV score as this test

---

2. Dr. Connell rescored the WAIS-IV test results after noticing several errors in the raw test data. She stated that the corrected full-scale IQ score was 82. Dr. Connell added, "These obtained scores are consistent with Dr. Woods's prior opinion that they fall in the low average range and are not consistent with an intellectual disability."

was published in 2008 and administered to him in 2013." Dr. Connell concluded that "even with considering the Flynn Effect, * * * none of Mr. Ford's IQ test results are consistent with a diagnosis of intellectual disability."

{¶ 67} As to adaptive functioning, Dr. Connell reported that a formal adaptive-functioning measure was completed when Ford was administered the Vineland Adaptive Behavior Scales ("VBS") in December 2003 when he was in third grade. Dr. Connell stated that these test results identified deficits in adaptive functioning. However, she noted that "the special education team determined that this was due to a specific learning disability and did not find that intellectual disability was the cause of his adaptive functioning limitations."

{¶ 68} Dr. Connell conducted the Vineland Adaptive Behavior Scales–II ("VBS-II") test. She relied on information from her interviews and observations of Ford, an interview with his mother, and scores from his school achievement tests. Dr. Connell stated that none of the VBS-II scores indicated a significant deficit.

{¶ 69} Dr. Connell used the standards set forth in the *DSM-5* and the *AAIDD-11* and concluded that Ford did not meet the diagnostic criteria for intellectual disability.

### b. Dr. Karpawich's evaluation

{¶ 70} Ford refused to participate in a psychological evaluation by Dr. Karpawich. Thus, his evaluation was based on a review of records and a meeting with Ford's mother.

{¶ 71} Dr. Karpawich reviewed Ford's IQ test results, including his 2006 score of 75 on the K-BIT2. As to this score, Dr. Karpawich testified:

> With an IQ of 75, if you take into consideration the standard error of measurement to be a 90 percent confidence level, that is—actual IQ is between 69 and 83. So that would be a range rather than just

an IQ score by itself you need to take into consideration what is the

range.

Dr. Karpawich discounted the two IQ scores that fell below 70 because of Ford's impulsive behavior and poor attention during both tests.

{¶ 72} In summarizing his opinion as to a possible intellectual disability, Dr. Karpawich stated: "All [of Ford's] IQ test results placed his intellectual functioning below average. However, he was not given the diagnosis of mental retardation/intellectual disability prior to the age of 18. His lowest IQ was 62 in 2003, but that evaluator noted that these results may 'underestimate' his ability." He added that "[o]ther test scores during his childhood placed his intellectual function in the borderline range (although the standard error of measurement on some tests cautioned that his actual IQ could be at 70 or below)."

{¶ 73} As to adaptive skills, Dr. Karpawich testified that Ford's 2003 results on the VBS test were at "the cutoff between mild mental retardation and borderline intelligence." During Dr. Karpawich's evaluation, Ford's mother completed an adaptive-behavior assessment. This standardized assessment of a person's adaptive functioning is conducted by asking questions of an informant. Dr. Karpawich stated that Ford's scores were below average in the areas of social behavior and social engagement and very poor for the social-adjustment factor. Dr. Karpawich testified: "[h]is scores were poor in the domains of conformity, trustworthiness, and disturbing interpersonal behavior" and "he's always had significant issues and still in the area of what we call social behavior. * * * [T]hese things have been increasingly evident over the years with Shawn, and these would all be considered adaptive behaviors." As to other adaptive behaviors, Ford tested "in the average range or above."

{¶ 74} Dr. Karpawich stated that he applied the legal standard set forth in R.C. 5123.01(N)[3] and *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, in diagnosing intellectual disability. He did not use the DSM standard, because "it has a lot of difficulties." Dr. Karpawich concluded: "Based upon the available information, it is my opinion with reasonable scientific certainty, that there is insufficient information to conclude that the defendant fulfills the criteria for mental retardation/intellectual disability."

### c. Dr. O'Bradovich's evaluation

{¶ 75} Dr. O'Bradovich's office administered the WAIS-IV and Ford received an overall score of 79. He also received an overall composite score of 87 on the VBS-II, which is in the adequate range. Dr. O'Bradovich stated that Ford's overall adaptive-behavior skills and his communication and socialization skills fell in the adequate range but his daily-living skills fell in the moderately low range. Dr. O'Bradovich determined that "[t]hese results are not indicative of significant deficits in adaptive functioning." She concluded that Ford is not intellectually disabled.

### d. Decision and findings of the trial court

{¶ 76} The trial court used the *Lott* test to determine whether Ford was intellectually disabled. Specifically, it evaluated whether the preponderance of the evidence demonstrates that Ford had "(1) significantly subaverage intellectual functioning, (2) *significant limitations in two or more adaptive skills*, and (3) onset of these conditions before the age of 18." (Emphasis added.) *See Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12.

{¶ 77} The trial court determined that Ford's IQ scores did not show that he had significantly subaverage intellectual functioning. The trial court agreed with

---

3. R.C. 5123.01(N) provides: " 'Intellectual disability' means a disability characterized by having significantly subaverage general intellectual functioning existing concurrently with deficiencies in adaptive behavior, manifested during the developmental period."

Dr. Connell's findings that Ford's IQ scores of 62 and 64 were not reliable measures of Ford's intellectual functioning.

{¶ 78} The trial court mentioned Dr. Karpawich's finding that Ford's IQ score of 75, when taking the SEM into consideration, resulted in an actual IQ score within a range between 69 and 83. However, the trial court did not discuss the significance of Dr. Karpawich's finding that the low range of the IQ scores fell below 70.

{¶ 79} As for adaptive deficits, the trial court stated: "All three experts who specifically evaluated defendant's adaptive skills and functioning testified that while Mr. Ford had limits in certain areas of adaptive skills, he could not be characterized as having '*significant limitations in two or more adaptive skills*.' " (Emphasis added.)

{¶ 80} The trial court concluded that Ford is not intellectually disabled, stating: "All of the evidence adduced at the *Atkins* hearing was consistent. None of the three experts was of the opinion that Mr. Ford has ever been intellectually disabled within the standards recognized by the American Psychiatric Association, the American Association on Intellectual and Developmental Disabilities, or *State v. Lott* [97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011]."

*C. Analysis*

1. SEM

{¶ 81} Ford argues that the trial court failed to account for the SEM when considering his IQ scores. *Hall* and *Moore I* require a trial court to consider the SEM when evaluating a defendant's IQ scores. As *Hall* explains, "The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score." *Hall*, 572 U.S. at 713, 134 S.Ct. 1986, 188 L.Ed.2d 1007. "[T]he SEM means that an individual's score is best understood as a range of scores on either side of the recorded score." *Id*.

**{¶ 82}** The trial court reviewed Ford's reported IQ scores on the WISC-III, the K-BIT2, two WAIS-IV tests, and the WASI. These scores included a CI range. Its significance is that the SEM, "which varies by test, subgroup or age group, is used to quantify the variability that is attributable to the test itself and *provides the basis for establishing a statistical CI within which the person's true score is likely to fall*." (Emphasis sic.) AAIDD, *User's Guide to Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports* 22 (11th Ed.2012).

**{¶ 83}** Dr. Karpawich reported that Ford's IQ score of 75 on the K-BIT2 had a 90 percent CI range of 69 to 83. As to these scores, the trial court stated, "Dr. Karpawich noted that although all of Mr. Ford's IQ tests generated below average scores, his tests had never placed him in the intellectually disabled range." (Footnote omitted.)

**{¶ 84}** However, as discussed above, the United States Supreme Court has ruled that when test scores, adjusted for the test's SEM, are below average, the scores are not enough to determine the question of disability. *Moore I* emphasizes additional scrutiny and "require[s] that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Moore I*, __ U.S. at __, 137 S.Ct. at 1050, 197 L.Ed.2d 416. The Supreme Court held that because Moore's score yielded a range of 69 to 79, the state court "had to move on to consider Moore's adaptive functioning." *Id*. at ___, 137 S.Ct. at 1049. Here, the trial court erred in disregarding the SEM, thus failing to recognize the lower end of the range in determining whether Ford's intellectual functioning was below average.

**{¶ 85}** The concurring-dissenting opinion discounts Ford's IQ scores because only one score established an IQ range of 69 to 83. It adds that this IQ test is "substantially outweighed" by the other tests and the unanimous view of all three

experts who determined that Ford is not intellectually disabled. Opinion concurring in part and dissenting in part at ¶ 452. However, Ford's higher performance on other IQ tests did not allow the trial court to ignore an IQ score that falls at or below 70. *See Moore* at __, 137 S.Ct. at 1048, citing *Hall,* 572 U.S. at 721-724, 134 S.Ct. 1986, 188 L.Ed.2d 1007. As for the unanimity of expert opinion, the legal determination of intellectual disability is distinct from a medical diagnosis. "[T]his determination is informed by the views of medical experts," but "[t]hese views do not dictate the court's decision." *Hall* at 721.

## 2. The Flynn Effect

{¶ 86} Ford argues that the trial court erred when it failed to take the Flynn Effect into account when evaluating his IQ scores.

{¶ 87} "The Flynn Effect * * * is a ' "generally recognized phenomenon" ' in which the average IQ scores produced by any given IQ test tend to rise over time, often by approximately three points per ten years from the date the IQ test is initially standardized." *Black v. Carpenter*, 866 F.3d 734, 738 (6th Cir.2017), fn. 1, quoting *Ledford v. Head*, N.D.Ga. No. 1:02-CV-1515-JEC 2008, WL 754486, *7, quoting testimony. Thus, "[t]he SEM is distinct from the Flynn Effect." *Id.* at 739, fn. 2.

{¶ 88} In discussing the Flynn Effect, Dr. Connell explained that it would have little impact on Ford's IQ scores on the K-BIT2 and the WAIS-IV because these were newer versions of the test when Ford took them. Dr. Connell stated that the Flynn Effect would be most relevant to the K-ABC, because that test was published in 1983 and administered to Ford in 2001. She stated that his IQ score of 78 on the K-ABC would be approximately an IQ score of 72 if the Flynn Effect was applied. Dr. Connell concluded that "even with considering the Flynn Effect, * * * none of Mr. Ford's IQ test results are consistent with a diagnosis of intellectual disability." However, as stated above, there is no indication that Dr. Connell considered the SEM, which would have extended Ford's IQ score on the K-ABC into a lower range.

**{¶ 89}** The trial court did not discuss the Flynn Effect when evaluating Ford's IQ scores. Neither the *Hall* nor the *Moore* decisions mention the Flynn Effect or require its application. There is also no legal or scientific consensus that requires an across-the-board downward adjustment to offset the Flynn Effect. *See Black* at 746 (noting that *Hall* does not require that IQ scores be adjusted for the Flynn Effect); *McManus v. Neal*, 779 F.3d 634, 653 (7th Cir.2015) (nothing in *Atkins*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, suggests that IQ scores must be adjusted by the Flynn Effect); *Smith v. Duckworth*, 824 F.3d 1233, 1246 (10th Cir.2016) ("*Hall* says nothing about the application of the Flynn Effect to IQ scores in evaluating a defendant's intellectual disability"); *but see Walker v. True*, 399 F.3d 315, 322-323 (4th Cir.2005) (stating that on remand, the district court should consider the Flynn Effect evidence).

**{¶ 90}** The AAIDD recommends that in "cases in which a test with aging norms is used as part of a diagnosis of [intellectual disability], a corrected Full Scale IQ upward of 3 points per decade for age of the norms is warranted." AAIDD, *User's Guide* at 23. Despite this recommendation, "*Hall* indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide. But neither does our precedent license disregard of current medical standards." *Moore I*, __ U.S. at __, 137 S.Ct. at 1049, 197 L.Ed.2d 416.

**{¶ 91}** We have not held that trial courts must apply the Flynn Effect to adjust a defendant's IQ score. But the Tenth District Court of Appeals has stated that "a trial court must consider evidence presented on the Flynn effect, but, consistent with its prerogative to determine the persuasiveness of the evidence, the trial court is not bound to, but may, conclude the Flynn effect is a factor in a defendant's IQ score." *State v. Burke*, 10th Dist. Franklin No. 04AP-1234, 2005-Ohio-7020, ¶ 51; *see also State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 100 (based upon IQ scores and the Flynn Effect, trial court was

justified in inquiring into whether an evaluation of the defendant's mental abilities was appropriate).

{¶ 92} We hold that the trial court should have discussed evidence presented on the Flynn Effect, although it was in the trial court's discretion whether to include it as a factor in the IQ scores.

### 3. The Currency of *Lott*

{¶ 93} Finally, Ford argues that the trial court used an outdated test in finding that he did not have significant limitations in two or more adaptive skills.

{¶ 94} In reviewing adaptive skills, the trial court stated that Dr. Karpawich noted that Ford has "always had 'significant issues' in the area of social behavior." The trial court added:

> [Dr. Karpawich] indicated this area includes things like "being impulsive, not assuming responsibility, poor social judgment, not considering long-term consequences of his actions, reacting poorly when he becomes frustrated, not able to cope with stress, disrupting other people, acting out in the community. All these things have been increasingly evident over the years with Shawn, and these would all be considered adaptive behaviors."

Despite these findings, the trial court applied the test developed in *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, and determined that Ford "could not be characterized as having 'significant limitations in two or more adaptive skills.' "

{¶ 95} As discussed earlier, the current diagnostic standards require significant deficits in *any* of the three adaptive-skill sets (conceptual, social, and practical) in determining whether a defendant is intellectually disabled. *See Moore I*, __ U.S. at __, 137 S.Ct. at 1046, 197 L.Ed.2d 416; *AAIDD-11* at 43; *DSM-5* at

24

37. Thus, the trial court used the wrong standard in finding that Ford did have not significant limitations in his adaptive skills.

{¶ 96} The concurring-dissenting opinion seeks to tweak *Lott* rather than overrule what is an improper standard for assessing intellectual disability. The opinion says that the evidence reflected the experts' application of the current standards and that any problem with *Lott* was not prejudicial to Ford. Opinion concurring in part and dissenting in part at ¶ 450. In the context of a capital case, we decline to glean this finding from the record. *Lott* requires a finding of significant deficits in two or more adaptive-skill sets, but the current diagnostic standards require significant deficits in *any* of the three adaptive-skill sets. Dr. Karpawich applied the *Lott* test in conducting his diagnosis, and the trial court applied the *Lott* test in determining that Ford was not intellectually disabled. Under these circumstances, we have no confidence in the trial court's determination based on its application of an improper standard.

{¶ 97} *Lott* is outdated in requiring a finding of "significant limitations in two or more adaptive skills." 97 Ohio St.3d 303, 2003-Ohio-6625, 779 N.E.2d 611, ¶ 12. Moreover, *Lott*'s holding that there is a rebuttable presumption that a defendant is not intellectually disabled if his or her IQ score is above 70 is no longer valid. IQ scores are imprecise and "should be read not as a single fixed number but as a range." *Hall*, 572 U.S. at 712, 134 S.Ct. 1986, 188 L.Ed.2d 1007.

{¶ 98} As it did in *Lott*, it is appropriate for this court to provide guidance to the trial court and other courts to apply going forward. The standard that was recently adopted by the Supreme Court of Kentucky in *Woodall v. Commonwealth*, 563 S.W.3d 1 (Ky.2018) (recognizing that *Moore I* likely invalidated Kentucky's statutory definition of intellectual disability) provides such guidance. *Id*. at 6; *see* Ky.Rev.Stat.Ann. 532.130(2).

{¶ 99} The Supreme Court of Kentucky stated:

In an attempt to provide guidance to courts confronting this issue, we shall attempt to fashion a rule. The U.S. Supreme Court in *Moore* favorably viewed what appears to be the "generally accepted, uncontroversial intellectual-disability diagnostic definition," * * * "which identifies three core elements: (1) intellectual-functioning deficits (indicated by an IQ score 'approximately two standard deviations below the mean'—*i.e.*, a score of roughly 70—adjusted for the 'standard error of measurement' [*AAIDD-11* at 27]; (2) adaptive deficits ('the inability to learn basic skills and adjust behavior to changing circumstances,' [*Hall v. Florida*, 572 U.S. ___, ___, 134 S.Ct. 1986, 1994, 188 L.Ed.2d 1007 (2014)]); and (3) the onset of these deficits while still a minor."

*Woodall* at 6-7, quoting *Moore I*, __ U.S. at __, 137 S.Ct. at 1045, 197 L.Ed.2d 4165; *see also State v. Thurber*, 308 Kan. 140, 420 P.3d 389, 450-452 (2018) (severing portions of Kansas statutes that ran afoul of *Moore I* and *Hall*).

### D. Conclusion

{¶ 100} Accordingly, we remand this matter to the trial court to properly determine whether Ford is intellectually disabled. *Lott*'s holding that there is a rebuttable presumption that a defendant is not intellectually disabled if his or her IQ score is above 70 is no longer valid. For purposes of eligibility for the death penalty, a court determining whether a defendant is intellectually disabled must consider three core elements: (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—i.e., a score of roughly 70 or lower when adjusted for the standard error of measurement, (2) significant adaptive deficits in any of the three adaptive-skill sets (conceptual, social, and practical), and (3) the onset of these deficits while the defendant was a

minor. The trial court may consider expert testimony and appoint experts if necessary in deciding this issue. The trial court shall make written findings and set forth its rationale for finding the defendant intellectually disabled or not intellectually disabled.

## IV. Remaining Issues

{¶ 101} We now address Ford's remaining propositions of law. For ease of discussion, we will address them out of turn.

### A. Joinder of Offenses at Trial

{¶ 102} In proposition of law No. VII, Ford argues that the trial court erred by failing to grant the defense motion to sever the felonious-assault charge in Count 11 from the remaining charges.

{¶ 103} "Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged * * * are of the same or similar character * * *." Crim.R. 8(A). Crim.R. 8(A) also allows the joinder of offenses that "are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Permitting joinder "conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that can occur in successive trials before different juries." *State v. Hamblin*, 37 Ohio St.3d 153, 158, 524 N.E.2d 476 (1988).

{¶ 104} "Notwithstanding the policy in favor of joinder," Crim.R. 14 permits a defendant to request severance of the counts in an indictment "on the grounds that he or she is prejudiced by the joinder of multiple offenses." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 49. The defendant "has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Torres,* 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). But even

if the equities appear to support severance, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could have introduced evidence of the joined offenses as other acts under Evid.R. 404(B) or (2) the "evidence of each crime joined at trial is simple and direct," *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

{¶ 105} In his motion for severance, Ford argued that the offenses should be severed because there was no evidence that the incidents were part of a common scheme or plan or a course of criminal conduct and because the felonious assault and murders involved different dates, locations, and victims. The state argued that joinder was proper because the assault set a series of related events into motion and helped to prove Ford's motive and intent to commit the murders. The trial court denied the motion, finding that "the events that occurred on March 23, 2013 were connected to the events which took place on April 2, 2013."

{¶ 106} We review a trial court's ruling on a Crim.R. 14 motion for an abuse of discretion. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166. A defendant who appeals the denial of relief bears a heavy burden:

> He must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial.

*State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992). "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985), citing *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

"A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 107} Ford fails to show that "no sound reasoning process" supported joinder, and thus he fails to establish an abuse of discretion.

{¶ 108} First, it is reasonable for the trial court to agree with the state that the felonious assault of Chelsea set a series of related events into motion and helped to prove Ford's motive and intent to commit the aggravated burglary and murders. Ford's assault of Chelsea resulted in her hospitalization. Given the close proximity of the offenses and the relationship of the victims, Ford has failed to demonstrate that the trial court acted unreasonably.

{¶ 109} Second, it was not unreasonable for the court to find that the evidence of the felonious assault would have been admissible under Evid.R. 404(B) as evidence of motive. Evid.R. 404(B) recognizes that evidence of other crimes may "be admissible for * * * proof of motive, opportunity, intent, preparation, [or] plan." Evidence of the assault on Chelsea and her hospitalization was admissible as tending to show Ford's motive, opportunity, and intent in committing the burglary and murders. Thus, even if these counts had been tried separately, the state would have been allowed to present evidence of other acts—the assault and hospitalization—to prove the opportunity and motive to commit the theft and ultimately the aggravated murders. *See State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 34.

{¶ 110} Third, the evidence of each crime was direct. Zachary, Joshua, Chelsea, King, and Heather testified mainly about Chelsea's assault, hospitalization, and the subsequent investigation. The remainder of the testimony focused on the murders. Although the evidence presented to prove the murders was a bit more complex than the evidence presented to prove the assault, it was not confusing. *See id.* at ¶ 37; *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54

N.E.3d 80, ¶ 64. Moreover, Ford admitted committing the assault and the murders. A jury is capable of segregating the proof of multiple charges when, as in this case, the evidence of each crime is uncomplicated. *See State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 52.

{¶ 111} Finally, Ford cites *State v. Atkinson*, 4 Ohio St.2d 19, 211 N.E.2d 665 (1965), in support of his argument that there was no overlap of evidence between the two counts and each count could have been tried without reference to the other. In *Atkinson*, the defendant was charged with one count of forging a check, one count of uttering the check, and one count of carrying a concealed weapon. *Id*. Because the checks and the concealed weapon, a blackjack, were found in the defendant's car during a traffic stop, the prosecutor argued that the offenses arose out of the same investigation. *Id*. at 20. The trial court overruled the defendant's objection to joinder. This court reversed, holding that there is "no proof or evidence * * * of any connection between the check counts and the blackjack count in the commission of any offense." *Id*. at 21. Here, as discussed above, there is sound reasoning that connects the felonious assault of Chelsea and a week later, the aggravated burglary and the murder of her parents. It is reasonable that evidence of the felonious assault of Chelsea would have been admitted in the murder trial. More important, Ford has not met his burden to show that the trial court abused its discretion when it overruled his objection to joinder. *Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 166.

{¶ 112} Based on the foregoing, we reject proposition of law No. VII.

### B. Limitations on Voir Dire

{¶ 113} In proposition of law No. IV, Ford argues that the trial court improperly limited defense counsel from fully questioning prospective jurors about possible mitigating evidence during voir dire. He primarily argues that defense counsel should have been permitted to question prospective jurors about youth as a mitigating factor.

{¶ 114} We have repeatedly held that a trial court is under no obligation to allow counsel to question a prospective juror about specific mitigating factors. *See State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 152; *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 59-60.

{¶ 115} First, Ford argues that the trial court improperly sustained an objection to the questioning of prospective juror No. 47, when defense counsel asked: "Would you be willing to give meaningful consideration to things such as age?" However, the trial court had earlier asked the same question. During preliminary inquiry, the trial court informed juror No. 47 that jurors must meaningfully consider any mitigating evidence and mentioned that "one example of mitigating evidence might be the youth * * * of the defendant." Juror No. 47 said she would be able to follow the law and give meaningful consideration to such evidence. Thus, we conclude that the trial court did not improperly disallow the question regarding age as it had already been asked.

{¶ 116} Second, Ford complains about not being allowed to ask prospective juror No. 25 about whether he would give meaningful consideration to the defendant's upbringing. The trial court initially sustained an objection to such questioning. But after defense counsel rephrased the question, juror No. 25 indicated that he would meaningfully consider such evidence. Accordingly, this claim lacks merit.

{¶ 117} Third, Ford argues that the trial court erred by not allowing defense counsel to ask prospective juror No. 19: "Let's say we introduced evidence that Shawn is a young guy, he was 18 when this happened. Does that have any effect on you?" The trial court sustained an objection to this question, stating: "The juror cannot be asked to engage in the process, at this point not having heard any evidence, or make commitments based on hypotheticals." The trial court added: "The question at hand is whether the juror would meaningfully consider any mitigating evidence, whatever that may be. That's the question."

{¶ 118} The trial court did not err in precluding this question. *See State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 64. Moreover, juror No. 19 was excused for other reasons before the trial-phase deliberations were completed. Thus, no possible error occurred.

{¶ 119} Ford also argues that "in the limited circumstances" when defense counsel were permitted to mention age as a possible mitigating factor, they were "never allowed" to determine whether the jurors would consider it. But the voir dire questioning of the jurors who participated in the deliberations belies this claim. The trial court defined mitigation and informed each of the participating jurors that they must meaningfully consider any evidence that would mitigate against the imposition of the death penalty. The trial court and/or the defense counsel also informed each of those jurors that Ford's youth was a mitigating factor and each of them indicated that they would consider such evidence. Therefore, this claim also lacks merit.

{¶ 120} Based on the foregoing, we reject proposition of law No. IV.

*C. Voir Dire Misstatements*

{¶ 121} In proposition of law No. V, Ford argues that during voir dire, the trial court misstated the proper standard for voting on the death penalty and the prosecutor made various misstatements about the aggravating circumstances, mitigating evidence, and weighing process.

1. Trial Court's Misstatements

{¶ 122} Ford argues that, while individually questioning prospective jurors, the trial court advised them that they would have to unanimously find that the aggravating circumstances did not outweigh the mitigating factors before moving on to one of the life-sentence options.

{¶ 123} During individual voir dire, the trial court informed three prospective jurors who later participated in deliberations that if the jury did not *unanimously* find beyond a reasonable doubt that the aggravating circumstances

outweigh the mitigating factors, the jury could not return a verdict for the death penalty.  The trial court provided similar, but slightly different instructions to other prospective jurors who participated in deliberations.  For example, prospective juror No. 39 was told:

> Now, if at the end of the mitigation part, the second trial, the jury decides beyond a reasonable doubt *unanimously* that the aggravating circumstances outweighed the mitigating factors or evidence, then the jury would be required to sign the verdict for the death penalty.
>
> * * *
>
> Now, on the other hand, if * * * the jury decides * * * that the aggravating circumstances do not outweigh beyond a reasonable doubt the mitigating factors, then the jury could not impose or require a death penalty.

(Emphasis added.)

{¶ 124} Because Ford did not object to the trial court's comments, we review these claims only for plain error.  To prevail, Ford must show that an error occurred, that the error was plain, and that but for the error the outcome of the trial clearly would have been otherwise.  *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 69.

{¶ 125} It is error to require a jury to unanimously reject a death verdict before considering one of the life-sentence options.  *State v. Brooks*, 75 Ohio St.3d 148, 160, 661 N.E.2d 1030 (1996).  But the trial court's voir dire instructions did not do that.  The instructions that the trial court gave prior to the jury's mitigation-phase deliberations informed the jury that unanimity was not required before it considered life options.  These mitigation-phase instructions cured any earlier

misunderstandings on this point during voir dire. *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 237. We hold that no plain error occurred.

## 2. Prosecutor's Misstatements

{¶ 126} Ford argues that the prosecutor's misstatements during voir dire resulted in a jury that could not properly consider mitigation and engage in the appropriate weighing process. However, except where noted, defense counsel failed to object to the prosecutor's comments and thus forfeited all but plain error.

{¶ 127} Ford argues that during voir dire the prosecutor improperly (1) referred to the aggravating circumstances as the "bad facts," (2) called mitigation "background stuff," (3) equated the weighing process to "how much it matters to you," and (4) mentioned "I like that one" as a way to consider a mitigating factor and "[t]hat doesn't mean a thing to me" as a way to reject it.

{¶ 128} The prosecutor's shorthand references to the aggravating circumstances, mitigating evidence, and the weighing process were casual and imprecise. But no plain error occurred. Moreover, any misstatements by the prosecutor were cured by the trial court's instructions prior to the mitigation-phase deliberations. *See Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 293; *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 147.

{¶ 129} Defense counsel also objected during voir dire that the prosecutor referred to mitigation as an excuse. *See State v. Getsy*, 84 Ohio St.3d 180, 200, 702 N.E.2d 866 (1998) (mitigating factors do not justify or excuse crimes). But the trial court sustained objections to this line of questioning. Moreover, the trial court's later instructions cured any possible error. *Dean* at ¶ 293.

{¶ 130} Based on the foregoing, we reject proposition of law No. V.

*D. Defense Jury Challenges*

{¶ 131} In proposition of law No. VI, Ford argues that the trial court erred by failing to excuse eight prospective jurors who were "obviously biased" and "predisposed to impose the death sentence."

{¶ 132} The United States Supreme Court and this court have long recognized that a defendant's right to a fair and impartial jury extends to capital sentencing. Accordingly, "[a] prospective juror in a capital case may be excused for cause if his views on capital punishment would ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 38, quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). If a juror would "automatically vote for the death penalty in every case," the juror cannot be fair and impartial because he or she "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.*

{¶ 133} When a defendant challenges a prospective juror for cause, the trial court's ruling "will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." *State v. Williams*, 79 Ohio St.3d 1, 8, 679 N.E.2d 646 (1997).

{¶ 134} We have also held that a "defendant in a criminal case cannot complain of error in the overruling of a challenge for cause if such ruling does not force him to exhaust his peremptory challenges." *State v. Eaton*, 19 Ohio St.2d 145, 249 N.E.2d 897 (1969), paragraph one of the syllabus, *death penalty vacated on other grounds,* 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750 (1972). Thus, "[i]f the trial court erroneously overrules a challenge for cause, the error is prejudicial

only if the accused eliminates the challenged venireman with a peremptory challenge *and* exhausts his peremptory challenges before the full jury is seated." (Emphasis sic.) *State v. Tyler*, 50 Ohio St.3d 24, 30-31, 553 N.E.2d 576 (1990).

{¶ 135} Of the eight challenged prospective jurors, two (jurors Nos. 39 and 72) were seated and three (jurors Nos. 25, 36, and 45) were excused through peremptory challenges. The jury was seated before the remaining three prospective jurors (jurors Nos. 103, 106, and 134) could have been selected. Defense counsel used only five of Ford's six peremptory challenges during jury selection.

1. Prospective Juror No. 39

{¶ 136} On the death-penalty questionnaire, juror No. 39 circled an answer stating that the death penalty was the "proper punishment in some cases, but not the proper punishment in some other cases." She explained that "[e]very circumstance is different. And it depends on the evidence." During individual voir dire, juror No. 39 stated that she believed in the death penalty, but added, "I don't believe it should be handed down in every case." She also indicated that she would meaningfully consider any mitigating evidence.

{¶ 137} Juror No. 39 disclosed during questioning that her spouse was convicted of murder in Summit County in 2003 and was imprisoned. But she stated, "It is not going to affect my ability to be fair," because "he was doing stuff he had no business doing." She added, "And, to me, this—it sat him down to get himself together. That's how I look at it." Defense counsel challenged juror No. 39 for cause, arguing that her husband's imprisonment "makes it difficult for her to be fair and impartial." The trial court overruled this challenge.

{¶ 138} Ford contends that juror No. 39 was an automatic-death-penalty juror because she stated, "I feel like if you are found guilty of a crime and that's an option, then I agree with it." He also argues that juror No. 39 should have been excused because her husband was in prison. We review this claim on the basis of

plain error, because Ford failed to exercise all of his peremptory challenges. *Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 72.

{¶ 139} Juror No. 39 assured the court that she would follow the law and could consider a life sentence. Her responses on the death-penalty questionnaire showed that she took a moderate view of the death penalty. Juror No. 39 also said that her husband's conviction and imprisonment would not influence her ability to be fair. *See State v. Allen*, 73 Ohio St.3d 626, 629, 653 N.E.2d 675 (1995) (prospective juror whose brother was a homicide victim was permitted to remain as a capital juror after assuring the court that she could set her feelings aside and remain impartial). We hold that the trial court committed no plain error by failing to excuse juror No. 39.

### 2. Prospective Juror No. 72

{¶ 140} On her death-penalty questionnaire, juror No. 72 stated, "I believe in the death penalty." She also circled an answer stating that the death penalty was the "proper punishment in some cases, but not the proper punishment in some other cases." During individual voir dire, juror No. 72 expressed her willingness to follow the law and meaningfully consider any mitigating evidence before concluding whether a death-penalty verdict should be returned.

{¶ 141} First, Ford claims that the trial court erred by not excusing juror No. 72 because the state's questioning diminished the value of mitigating evidence by calling it "excuses." At trial, defense counsel argued that this juror was "irreparably harmed" by the prosecutor's remarks, because they minimized any potential mitigating evidence. The trial court overruled the defense challenge, stating that juror No. 72 expressed her willingness to follow the law and meaningfully evaluate the mitigating evidence. The trial court added, "I don't conclude that she has been tainted. The jury will be given instructions regarding this topic on multiple occasions." Additionally, the trial court sustained objections to this line of questioning during voir dire. The trial court's mitigation-phase

instructions also cured any earlier misstatements. *Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 293.

{¶ 142} Second, Ford argues that juror No. 72 demonstrated that she was unduly biased by stating, "I think that there are some very sick individuals that can't be rehabilitated." Ford adds that when counsel asked a follow-up question suggesting that juror No. 72 would not be open to mitigation, she stated, "So what, is there a question there?" However, juror No. 72 stated that she would follow the law, would meaningfully consider mitigating evidence, and could impose a life sentence. "The fact that the defense counsel was able to elicit somewhat contradictory viewpoints from [this juror] during his examination does not, in and of itself, render the court's judgment erroneous." *State v. Scott*, 26 Ohio St.3d 92, 98, 497 N.E.2d 55 (1986) "[D]eference must be paid to the trial judge who sees and hears the juror." *Witt*, 469 U.S. at 426, 105 S.Ct. 844, 83 L.Ed.2d 841.

{¶ 143} Third, Ford argues that he was precluded from ascertaining juror No. 72's views about the death penalty because he was not allowed to ask whether she believed in the notion that "if you take a life, you lose a life." The trial court sustained an objection to such questioning, stating: "Well, the question is whether you could give meaningful consideration to any and all mitigating evidence." Juror No. 72 replied that she could.

{¶ 144} Crim.R. 24 and R.C. 2945.27 afford both the prosecution and defense the opportunity to conduct reasonable voir dire. Nevertheless, the scope of voir dire falls within the trial court's sound discretion and varies depending on the circumstances of a given case. *LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 40. While restrictions on voir dire have generally been upheld, any limits on voir dire must be reasonable. *Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 48. Moreover, we will not find prejudicial error in a trial court's qualification of venirepersons as fair and impartial jurors unless the defendant can show a clear abuse of discretion. *Id.*

**{¶ 145}** The record belies Ford's claim that the trial court unduly limited defense questioning about juror No. 72's views about the death penalty. Defense counsel had earlier presented a hypothetical that mirrored the evidence in the Schoberts' murders. Juror No. 72 was then asked if that was "a case where [she] would think that it's automatic for the death penalty?" She responded that it was not necessarily an automatic-death-penalty case, because "there may be mitigating circumstances that * * * sway that decision." Thus, we conclude that Ford fails to show that the trial court abused its discretion in sustaining the state's objection to defense counsel's later question about juror No. 72's views.

**{¶ 146}** Fourth, Ford invokes *White v. Mitchell*, 431 F.3d 517 (6th Cir.2005), in arguing that prospective juror No. 72's contradictory statements show that she should have been excused for cause. Yet *White* is readily distinguishable. Despite cursory statements that she could follow the law, the juror in *White* repeatedly expressed doubt as to whether she could follow the law and stated that "she did not think it would be fair to the defendant for her to sit on the jury." *Id.* at 541. *White* presented a "particularly egregious situation in which an individual desired to participate on a jury because she wanted to provide one of the twelve votes for death against a particular defendant." *Trimble v. Bobby*, 804 F.3d 767, 779 (6th Cir.2015). The voir dire of prospective juror No. 72 in this case contains nothing comparable.

**{¶ 147}** Ford also raises *Wolfe v. Brigano*, 232 F.3d 499 (6th Cir.2000), in arguing that the trial court erred by accepting the juror's tentative promises to try to be fair and impartial. In *Wolfe*, one juror had an ongoing business relationship with the victim's parents, another juror and her husband were friends with the victim's parents whom they often visited, a third juror admitted that she would have difficulty putting aside what she had gleaned from media reports in deciding the case, and the fourth juror doubted that he would require the state to prove its case beyond a reasonable doubt. *Id.* at 502-503. The trial court overruled defense

challenges for cause against these jurors. The United States Court of Appeals for the Sixth Circuit reversed, holding that "it appear[ed] that the trial judge based his findings of impartiality exclusively upon each juror's tentative statements that they would try to decide this case on the evidence presented at trial. Such statements, without more, are insufficient." *Id.* at 503.

{¶ 148} Unlike in *Wolfe*, the trial court here did not overrule a challenge for cause against juror No. 72 based only upon "tentative statements" that she would try to be fair and impartial. Juror No. 72 assured the court that she *would* follow the law before concluding whether a death-penalty verdict should be returned. She also knew little about the murders, and there is no evidence that she knew the victims or their family. *Wolfe* is dissimilar to the present case.

{¶ 149} Finally, Ford argues that this court should not find waiver—that he loses the right to challenge a juror not being removed when he had a peremptory challenge he could have used to remove a juror—because there was only one peremptory challenge that he did not use. He claims that if he had used that peremptory challenge to remove either juror No. 39 or No. 72, he would still have been faced with one biased juror sitting on the case. But nothing shows that these jurors were unduly biased. Moreover, we have invoked the waiver rule in other cases in which defense counsel used five of their six peremptory challenges. *See, e.g., State v. Hale,* 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2 864, ¶ 88. Thus, we also reject this claim here.

{¶ 150} In conclusion, the trial court committed no plain error in overruling the challenge for bias against juror No. 72.

3. Prospective Juror Nos. 25, 36, and 45

{¶ 151} Of the remaining challenged jurors, the defense excused prospective juror Nos. 25, 36, and 45 with peremptory challenges.

{¶ 152} Prospective juror No. 25 believed that the death penalty "fits" for someone like Jeffrey Dahmer. However, prospective juror No. 25 stated that he

would not automatically vote for the death penalty and would follow the court's instructions before deciding on a sentence. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 71.

{¶ 153} Prospective juror No. 36 stated that the "circumstances of the crime should possibly dictate whether or not a death penalty sentence has occurred. For example, if it is a police officer, I think that's automatic." But prospective juror No. 36 stated that he did not believe the death penalty was appropriate in every case, he would follow the law, and he could impose a life sentence. Ford also argues that the trial court erred in failing to excuse prospective juror No. 36 because his answers during voir dire showed that he lacked the capability of doing the job as a juror. However, when "a prospective juror is being challenged for bias, '[d]eference must be paid to the trial judge who sees and hears the juror.' " *State v. White*, 82 Ohio St.3d 16, 20, 693 N.E.2d 772 (1998), quoting *Witt*, 469 U.S. at 426, 105 S.Ct. 844, 83 L.Ed.2d 841.

{¶ 154} Prospective juror No. 45 believed that the death penalty is "one of the greatest deterrents to crime." He added, "I believe if a man is found guilty, and beyond a shadow of a doubt, that he committed that crime with the intent to cause bodily harm or death, then the death penalty should be considered." Under further questioning, prospective juror No. 45 told the court that he was not in favor of the death penalty in every case and would follow the court's instructions. Ford challenged prospective juror No. 45, arguing that he should be excused because he has a "proof problem" and "the only time that death is not going to be appropriate punishment for him is when there is a problem with the State's case in chief." The trial court overruled the challenge.

{¶ 155} Ford argues that prospective juror No. 45 should have been excused because of his confusion about the burden of proof. However, prospective juror No. 45 later clarified that he equated the term "beyond a shadow of a doubt" with "beyond a reasonable doubt." But the trial court was able to see and hear

prospective juror No. 45, *Witt* at 426, and therefore had "the benefit of observing [the juror's] demeanor and body language," *Williams*, 79 Ohio St.3d at 8, 679 N.E.2d 646. Nothing in the record suggests that the trial court acted unreasonably by believing this juror's statement that he would follow the instructions.

{¶ 156} We hold that the trial court's denial of automatic-death-penalty challenges of these prospective jurors did not constitute plain error.

### 4. Prospective Juror Nos. 103, 106, and 134

{¶ 157} Ford objects to the trial court's failure to excuse prospective juror Nos. 103, 106, and 134, because he says they were automatic-death-penalty jurors. However, Ford could not have suffered any prejudice, because the jury was seated before any of them could have been selected as members of the jury. *See Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 90.

{¶ 158} Based on the foregoing, we reject proposition of law No. VI.

### E. Shackling

{¶ 159} In proposition of law No. XV, Ford argues that the trial court erred when it ordered that he be shackled without holding a hearing.

{¶ 160} No one should be tried while shackled, absent unusual circumstances. *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 219, citing *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The use of restraints tends to erode the presumption of innocence that the justice system attaches to every defendant. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 79. But it is widely accepted that a prisoner may be shackled when there is a danger of violence or escape. *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 82. The decision to require restraints is left to the sound discretion of the trial court, which is in a position to consider the defendant's actions both inside and outside the courtroom as well as his demeanor while the court is in session. *Id.*

1. Rulings on Restraints

{¶ 161} The trial court ordered that Ford be restrained at all proceedings because he had expressed a desire to hurt himself and in order to protect people in the courtroom in the event of a violent outburst.

{¶ 162} In July 2013, Ford filed a pretrial motion requesting to appear at all proceedings without restraints. Later that month, the trial court overruled the motion, stating that Ford would be restrained at all proceedings but would "appear without visible restraints during his trial."

{¶ 163} After the trial court's ruling on the motion to appear without restraints, Ford was placed on suicide watch at the jail. Dr. Byrnes, who examined Ford during a competency evaluation, sent a letter to the court in August stating that Ford's "incarceration has been stressful. He has expressed suicidal ideation and suicidal precautions have been implemented in the jail." At a pretrial hearing that month, Ford complained about being on suicide watch and forced to wear a padded gown. Defense counsel acknowledged that Ford mentioned "jumping over the railing after court and things like that." When asked about these comments, Ford told the trial court, "I really will end up doing it. Like, if I got to be in [the mental-health unit] for * * * the rest of this week, I am going to do it. Like, I don't care any more."

{¶ 164} At a pretrial hearing in November 2013, the trial court stated that "at any point where Mr. Ford could be seen by any member of a jury, he will be seen only in street clothes in accordance with the normal procedures. There will be restraints underneath those clothes, again, consistent with normal procedures."

{¶ 165} Nearly one year later, in October 2014, the trial court filed an updated ruling on Ford's motion to appear without restraints, stating:

SUPREME COURT OF OHIO

This case involves the alleged brutal and violent attacks by defendant on three different individuals, two of whom died as a result of the attacks. * * *

* * * Given the violent nature of the crimes and the defendant expressing a desire to harm himself, the court found that extra security measures were necessary in this case. * * *

* * *

As indicated in its July 26, 2013 journal entry, the defendant will be restrained during the jury trial of this case but his restraints will not be visible to the jury. The court finds that such restraints are necessary in part to prevent defendant from attempting suicide in the courthouse but also to protect spectators and others in the event of a violent outburst by defendant.

2. Analysis

{¶ 166} Ford argues that the trial court should have conducted an evidentiary hearing before ordering him placed in restraints. But a hearing on the necessity of restraints was not required. *See State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 108; *Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 82. Moreover, before the trial began, the trial court made findings that Ford's threats to hurt himself and the violent nature of the crimes were the basis for ordering restraints.

{¶ 167} Ford objects that the trial court's order was unsupported by testimony from jail personnel or statements from defense counsel that Ford was a suicide risk or danger to others. However, the trial court had observed Ford's demeanor in court. Dr. Byrnes reported that Ford expressed "suicidal ideation" and that "suicidal precautions [had] been implemented in the jail." Defense counsel also acknowledged that Ford had made suicidal comments to them, and Ford told

44

the court that he meant those remarks. Thus, there was adequate information before the court to support its ruling. *See Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, at ¶ 96.

{¶ 168} Ford cites *Neyland* at ¶ 105 in arguing that the trial court should have considered lesser alternatives to the use of restraints. In *Neyland*, we held that the trial court should have considered whether there were lesser alternatives to the use of leg restraints to provide adequate courtroom security. *Id*. But we rejected the claim of improper shackling, stating:

> [T]he trial court used restraints that were not visible to the jury rather than shackles or other visible types of restraints. Even though the record is unclear, it appears that the trial court considered the presence of deputies *and* the use of leg restraints as the least form of restraint necessary to ensure courtroom security.

(Emphasis sic.) *Id*. at ¶ 105.

{¶ 169} Here, the trial court stated, "Given the violent nature of the crimes and the defendant expressing a desire to harm himself, *the court found that extra security measures were necessary* in this case." (Emphasis added.) This implies that the trial court did consider lesser measures before ordering restraints. Even assuming that the trial court did not consider lesser measures, nothing in the record shows that the jurors saw Ford in restraints, so Ford suffered no prejudice.

{¶ 170} Ford contends that it is not apparent from the record what kind of restraints he was wearing during the trial. Although the exact type of restraints were not identified, the trial court's statements indicated that Ford would wear restraints underneath his clothing that were not visible to the jury. Nothing in the record shows that the jury ever observed Ford in restraints. Thus, we conclude that

he was not prejudiced. *Neyland,* 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, at ¶ 108.

{¶ 171} Finally, Ford argues that it is unclear whether restraints limited his ability to interact with counsel during trial. However, the defense never asserted that restraints interfered with the attorney-client relationship. He has thus forfeited all but plain error. *Id*. at ¶ 106. Both of Ford's hands were free throughout trial. Ford also does not complain that the restraints interfered with his ability to follow the proceedings and interact with counsel. *See id*. at ¶ 107. Accordingly, we conclude that no plain error occurred.

{¶ 172} Based on the foregoing, we reject proposition of law No. XV.

*F. Admissibility of Defendant's Statements to the Police*

{¶ 173} In proposition of law No. I, Ford argues that he was not properly advised of his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that his statements were involuntary because of police coercion and the use of an informant to obtain them. He also argues that police testimony about information obtained from an informant violated his Sixth Amendment right to confrontation and *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

1. Factual Background

{¶ 174} Before trial, Ford moved to suppress three statements that he made to the police on April 2, 3, and 4, 2013.[4] At the suppression hearing, Detectives Morrison and Hitchings testified that they conducted videotaped interviews of Ford, and all three recordings were played during the hearing. At the completion of the hearing, the trial court denied Ford's motion to suppress.

---

4. Ford was also interviewed about Chelsea's attack. Ford was not advised of his *Miranda* rights before that interview because there was no indication at that time that Ford was involved in her assault. Ford does not challenge the voluntariness of those statements or the failure to read him his *Miranda* rights as to that interview.

*a. April 2 interview*

**{¶ 175}** On April 2, 2013, Ford was interviewed at the Akron police department after the Schobert murders. Before questioning began, Morrison orally advised Ford of his *Miranda* rights as written on a pre-interview card, stating:

> You have the right to remain silent. Do you understand that? Anything you say can and will be used against you in a court of law. Do you understand that? You have the right to talk to a lawyer and have him or her present with you while you are being questioned. Do you understand that? If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. Do you understand that? You can decide anytime to exercise these rights and not answer any questions or make any statements. Do you understand that?

Ford indicated that he understood each of these rights.

**{¶ 176}** During the interview, Ford denied committing the murders. He stated that he had not been to the Schoberts' house for two weeks.

*b. April 3 interview*

**{¶ 177}** On April 3, Hitchings was informed that Ford had given Beech, a fellow inmate, information about the whereabouts of evidence related to the murders. Based on that information, the police found Jeffrey's car on an Akron street and gloves, a knife, and other evidence in a nearby storm drain.

**{¶ 178}** Later that day, Hitchings and Morrison talked to Ford at the Portage County jail. Ford was in jail on a warrant for lying about Chelsea's assault. Morrison advised Ford of his *Miranda* rights in the same manner as he had on the previous day. Once again, Ford indicated that he understood each of these rights.

{¶ 179} At the start of the interview, Morrison told Ford that they found the stolen car, that they had searched the sewers and found the gloves, and that they had his shoes with everybody's blood on them. Ford replied that he did not kill anybody. Morrison told Ford that they already knew that Chelsea's blood and the Schoberts' blood were on his shoes. Morrison added, "It's amazing when you know people at BCI how fast you can get this * * * tested."

{¶ 180} As Ford continued to deny the murders, Morrison said, "I was kind of hoping we could come here and get you ahead of the ball because right now the question is gonna come up very shortly, when they ask us how cooperative was he. Because when we go to grand jury, it's gonna be a decision on agg. murders or death penalties."

{¶ 181} The police also told Ford that his conversations with Beech about the details of the murder had been videotaped. Morrison added that nothing the police were telling him was a lie. Ford denied that he told Beech that he committed the murders. Morrison then said, "You're looking at automatic death penalty."

{¶ 182} Ford repeated that he did not kill the Schoberts. Morrison then said that they found his DNA on the latex gloves in the sewer. Ford said, "[T]his is life in jail." Morrison responded, "You need to quit looking at it like there's no possibility for you here. Because the possibility is here for you but it's not gonna be there if you sit here and lie." Hitchings then discussed the different life sentences for murder.

{¶ 183} After more than 20 more minutes elapsed, Ford told Morrison that he broke into the Schoberts' home with Zachary and Malik. He said that Zachary killed them both. He also stated that Zachary had had Jeffrey's cell phone and used it to text Margaret. The text messages were used to gauge what time Margaret would return home.

*c. April 4 interview*

**{¶ 184}** On April 4, the police reinterviewed Ford at the Portage County jail. Hitchings advised Ford of his *Miranda* rights in the same manner that Ford had been advised on the previous occasions. But Hitchings added, "Having those rights in mind that I've explained to you, do you wish to talk to us now?" Ford waived his rights and agreed to be interviewed.

**{¶ 185}** During this interview, Ford admitted killing the Schoberts.

2. Analysis

*a. Sufficiency of* Miranda *warnings*

**{¶ 186}** A suspect in police custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479, 86 S.Ct. 1602, 16 L.Ed.2d 694.

**{¶ 187}** A suspect may then knowingly and intelligently waive these rights and agree to make a statement. *Id.* In the context of *Miranda*, the United States Supreme Court has explained the two aspects of waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

{¶ 188} Ford argues that the police never secured a valid waiver of his *Miranda* rights, because they did not specifically ask him whether he wanted to waive his rights and speak to them before the interrogation began. However, a *Miranda* waiver need not be expressly made in order to be valid. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). A court may infer a waiver from a suspect's behavior, viewed in light of the surrounding circumstances. *See State v. Murphy*, 91 Ohio St.3d 516, 518, 747 N.E.2d 765 (2001).

{¶ 189} During the three days that he was questioned, Ford's videotaped statements show that he was alert and sober when he was advised of his rights. He did not ask for a further explanation or protest that he did not understand his rights. He demonstrated his ability to express his thoughts and recall his actions. We are not persuaded that police used coercive tactics to obtain the waiver. *See id.* at 519. Finally, Ford's argument does not apply to his third interview, because he was specifically asked whether he wanted to talk to the police after being advised of his rights.

{¶ 190} Although not raised at the suppression hearing, the record shows that Ford's IQ scores are low. However, deficient intelligence is but one factor in the totality of the circumstances that must be considered in determining the voluntariness of a confession. While a defendant's mental condition is a significant factor in the voluntariness calculus, it "does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' " *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶ 191} We conclude that Ford was capable of voluntarily waiving his rights despite his low intelligence. *See State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 56 (voluntary confession from an accused with an IQ score of 72 and no records of a major mental disorder); *State v. Bays*, 87 Ohio St.3d 15, 23, 716 N.E.2d 1126 (1999) (voluntary confession from an accused with an IQ score of 71, but who had done well in school and finished the tenth grade); *State v. Dailey*, 53 Ohio St.3d 88, 91-92, 559 N.E.2d 459 (1990) (voluntary confession from an 18-year-old accused with an IQ score of 71).

{¶ 192} Based upon the totality of the circumstances, we hold that Ford validly waived his *Miranda* rights.

### b. Voluntariness

{¶ 193} Ford argues that his police statements were involuntary because of police coercion and the use of an informant to obtain them.

### (1) Police coercion

{¶ 194} If a defendant challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence. *See Miranda*, 384 U.S. at 475, 86 S.Ct. 1602, 16 L.Ed.2d 694; *Connelly*, 479 U.S. at 168-169, 107 S.Ct. 515, 93 L.Ed.2d 473. Voluntariness of a confession is determined by "the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *death penalty vacated on other grounds,* 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). However, a waiver will not be deemed to be involuntary "*unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." (Emphasis sic.) *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 35.

**{¶ 195}** First, Ford argues that his statements were involuntarily obtained because the detectives lied to him about the evidence. The detectives did mislead Ford by telling him that BCI had tested the evidence and identified his DNA on the shoes and gloves and that his conversations with Beech had been recorded.

**{¶ 196}** The tactic of lying to a suspect about the evidence is not in itself sufficient to render a confession involuntary. *See Frazier v. Cupp*, 394 U.S. 731, 737-739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (false statement that a codefendant had confessed did not make statement involuntary); *Ledbetter v. Edwards*, 35 F.3d 1062, 1066, 1070 (6th Cir.1994) (false statements that defendant's fingerprints had been found at crime scene and that the victim and two witnesses had identified him did not render confession involuntary); *Bays*, 87 Ohio St.3d at 22-23, 716 N.E.2d 1126 (misleading defendant about the strength of the evidence against him did not make confession involuntary). However, the fact that the detectives misrepresented the evidence is a relevant factor in evaluating whether the totality of the circumstances renders the confession involuntary. *Frazier* at 739.

**{¶ 197}** Second, Ford contends that the detectives coerced his confession by telling him that they would be asked to comment on Ford's cooperativeness when the case was presented to the grand jury, because it would be a factor in deciding whether to charge him with aggravated murder or the death penalty.

**{¶ 198}** "Officers may discuss the advantages of telling the truth, advise suspects that cooperation will be considered, or even suggest that a court may be lenient with a truthful defendant." *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 111, citing *Edwards*, 49 Ohio St.2d at 41, 358 N.E.2d 1051. And "[a]dmonitions to tell the truth are considered to be neither threats nor promises." *State v. Loza*, 71 Ohio St.3d 61, 67, 641 N.E.2d 1082 (1994); *see also State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 29. Finally, it is not unduly coercive for a law-enforcement officer to mention potential punishments. *See State v. Western,* 2015-Ohio-627, 29 N.E.3d 245, ¶ 38 (2d Dist.);

*compare State v. Robinson*, 9th Dist. Summit No. 16766, 1995 WL 9424, *4 ("While a correct statement of the law may not render a confession involuntary, a misstatement of the law may cause such a confession to be involuntary").

{¶ 199} Here, contrary to Ford's claims, the detectives did not promise leniency if he confessed or threaten death if he did not. Instead, detectives presented him with the opportunity to clarify the facts of the case, so that the prosecutor could better determine whether an aggravated-murder charge was proper. *See Western* at ¶ 42 and 46. Moreover, detectives did not misstate the law in telling him that the death penalty was a potential punishment for the murders. *See Bays*, 87 Ohio St.3d at 23, 716 N.E.2d 1126.

{¶ 200} Third, Ford complains that police told him that the possibility of a lesser sentence was available for him but not if he continued to lie to them. Hitchings was admonishing Ford simply to tell the truth, and such comments were not unduly coercive. *See State v. Cooey*, 46 Ohio St.3d 20, 28, 544 N.E.2d 895 (1989); *State v. Knight*, 2d Dist. Clark No. 04-CA-35, 2008-Ohio-4926, ¶ 111 (officer's assertion to a suspect that he or she is lying or that the suspect would not have another chance to tell his or her side of the story does not automatically render a confession involuntary).

{¶ 201} Fourth, Ford complains that officers told him that he was looking at an "automatic" death penalty. Under R.C. 2929.03(D)(2) and (3), the death penalty is never automatic. *See generally Woodson v. North Carolina*, 428 U.S. 280, 301, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). A brief reference to the death penalty does not, by itself, render a subsequent confession involuntary when the statement merely illustrates the seriousness of the crime and the defendant's will was not overborne as a result of the statement. *State v. Garner*, 260 Neb. 41, 50, 614 N.W.2d 319 (2000). The Supreme Court of California has held that "[a] constitutional violation arises 'only where the confession results *directly* from the threat [capital] punishment will be imposed if the suspect is uncooperative, coupled

with a "promise [of] leniency in exchange for the suspect's cooperation." ' " (Emphasis added and brackets sic.) *People v. Winbush*, 2 Cal.5th 402, 453, 213 Cal.Rptr.3d 1, 387 P.3d 1187 (2017), quoting *People v. Holloway,* 33 Cal.4th 96, 116, 14 Cal.Rptr.3d 212, 91 P.3d 164 (2004), quoting *People v. Ray*, 13 Cal.4th 313, 340, 52 Cal.Rptr.2d 296, 914 P.2d 846 (1996).

{¶ 202} After reviewing the video of Ford's interview, we are not persuaded that the detectives' references to the death penalty were threats or that their remarks resulted in Ford's will being overborne. First, Ford continued to deny the murders after the "automatic death penalty" comment. The video shows that other officers consistently encouraged Ford to tell the truth and to be truthful about his involvement or any details he knew about the murders. Ford responded, "This is life in jail," and later added, "[M]urder ain't no way around it, that's life regardless." In other words, Ford expressed concern about life sentences and not the death penalty. Thus, we hold that the "automatic death penalty" comment did not render Ford's subsequent confession involuntary.

{¶ 203} As a final matter, Ford cites various cases to show that his statements were involuntary. However, these cases are readily distinguishable. *See Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (suspect told he would be allowed to call his wife only if he cooperated and gave the police a statement); *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (suspect questioned while in intensive-care unit, encumbered by tubes, needles, and breathing apparatus); *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (suspect threatened with the removal of state financial aid and of her children if she did not cooperate); *United States v. Tingle*, 658 F.2d 1332 (9th Cir.1981) (suspect coerced into confessing by threats that she would not see her child for a long time if she did not cooperate); *Williams v. Brewer*, 509 F.2d 227 (8th Cir.1974) (telling defendant of need to locate victim's body and give her a Christian burial, after defendant's attorney told law enforcement defendant should

not be questioned while he was being transported, violated right to counsel and rendered statements involuntary), *aff'd*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

{¶ 204} Based on the totality of the circumstances, we conclude that Ford's police statements were voluntarily made.

(2) Ford's statements to jailhouse informant

{¶ 205} Ford argues that his statements were involuntary because they were coerced through the use of a government informant.

{¶ 206} Ford and Beech were housed in the Portage County jail together. Beech was described as a "frequent visitor" in jail and was there on a burglary charge. Lt. Gregory Johnson, a Portage County Deputy Sheriff, testified that he was informed by a corrections officer on April 3 that Beech wanted to talk to him. Johnson testified that Beech told him, "There is an inmate I am housed with that's been talking to me, and I think he was involved in a murder." Beech then provided information that linked Ford to the Schobert murders.

{¶ 207} Prior to speaking to Beech, Johnson testified that he had no information about Ford other than what he read in the *Akron Beacon Journal*. He stated that Beech had not been asked to provide information about Ford. After providing the information, Beech indicated to Johnson that "he would appreciate if [Johnson] could make sure that the Court knew of his * * * cooperation, that he had come forward on his own." Johnson told Beech that he could not make any promises to him other than making sure that the prosecution and his attorney knew about his assistance. Johnson added that Beech had never been a source of information about other cases.

{¶ 208} Hitchings testified that detectives never called any officials in Portage County about Ford or the Schobert murder case before being informed about Beech's information. He added that he was not aware of any promises or inducements to obtain Beech's assistance. Beech did not testify at trial.

**{¶ 209}** In *Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473, the Supreme Court addressed the constitutional voluntariness of a statement made under circumstances not requiring *Miranda* warnings. The court held that coercive police activity is a necessary predicate to the finding that a statement is not "voluntary" within the meaning of the due-process clause. *Id*. at 167. Thus, the voluntariness analysis must focus on the crucial element of police overreaching. *See People v. Manning*, 182 Ill.2d 193, 208, 695 N.E.2d 423 (1998).

**{¶ 210}** Nothing in the record shows that Beech was acting as a state agent when talking to Ford. Indeed, during the suppression hearing, defense counsel acknowledged that they had no information showing that Beech was an agent. And although Beech may have been seeking more lenient treatment in his own case, he requested these favors only *after* repeating Ford's statements to the police. *See Bell v. Bell*, 512 F.3d 223, 233-234 (6th Cir.2008) (fact that an informant desired favorable treatment in return for his testimony does not, standing alone, demonstrate the existence of an implied agreement). There is no evidence of police overreaching.

**{¶ 211}** We also reject Ford's claim that *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), shows that his statements to Beech were involuntary. In *Fulminante*, the state used an inmate, who was a paid FBI informant, to elicit a confession from the defendant that was used to convict him. *Id*. at 283. On appeal, the Arizona Supreme Court had held that Fulminante's confession was coerced. *Id*. at 284. The United States Supreme Court agreed with this conclusion. *Id*. at 287. Unlike in *Fulminante*, however, Beech was not acting as a state agent when talking to Ford. Accordingly, we hold that Ford's statements to Beech were voluntary.

*c. Confrontation Clause*

**{¶ 212}** Ford argues that the trial court erred in permitting Hitchings to testify about Johnson's conversation with Beech, because it was inadmissible

hearsay and violated his Sixth Amendment right to confrontation. However, Ford failed to object to Hitchings's testimony at trial and thus has forfeited all but plain error.

{¶ 213} Ford complains about the following segment of Hitchings's testimony:

> [HITCHINGS]: We received a phone call from Lieutenant Greg Johnson from the Portage County Sheriff's Office. He is in charge of their Detective Bureau.
>
> [MR. LOPRINZI (prosecutor)]: All right. And in regards to him calling, what was it that he was calling about?
>
> [HITCHINGS]: I mean, he had called and relayed some information to us. And as a result of some information, we ended up checking some areas in Akron, and we ended up locating a—our stolen vehicle.

{¶ 214} Ford invokes *Crawford*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, in arguing that this testimony violated the Confrontation Clause, found in the Sixth Amendment to the United States Constitution. In *Crawford,* the Supreme Court held that the admission of testimonial statements made by a witness who did not appear at trial violates the Confrontation Clause, unless the witness "was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id*. at 53-54. Only testimonial hearsay implicates the Confrontation Clause. *See id.* at 59, fn. 9; *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 186.

{¶ 215} Hitchings's testimony was not hearsay because he was explaining the next investigative step in the case. Testimony offered to explain police conduct is admissible as nonhearsay if it satisfies three criteria: (1) "the conduct to be

explained [is] relevant, equivocal, and contemporaneous with the statements," (2) the probative value of the statements is not substantially outweighed by the danger of undue prejudice, and (3) "the statements cannot connect the accused with the crimes charged." *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27. Hitchings's testimony met these criteria. The testimony was relevant in explaining the next investigative step in the search for Jeffrey's vehicle, it did not connect Ford with the crimes, and it was not unduly prejudicial. Accordingly, Hitchings's testimony did not implicate Ford's confrontation rights or violate *Crawford*. We hold that no plain error occurred.

{¶ 216} Based on the foregoing, we reject proposition of law No. I.

### G. Impeachment of Heather Greathouse

{¶ 217} In proposition of law No. X, Ford argues that the state improperly impeached Heather Greathouse with her prior recorded statement and improperly played that statement for the jury's consideration.

### 1. Factual Background

{¶ 218} Heather testified that in early April 2013, Ford was living with her in Akron. Heather did "not really" talk to Ford about Chelsea's assault, and he never indicated any involvement in causing her injuries. Heather did not remember Ford being home on the evening of April 1, but she said Ford came home the next day. Heather indicated that she did "not really" talk to Ford that day and said that Ford never talked to her about what happened to the Schoberts.

{¶ 219} Heather acknowledged giving a statement to detectives in April 2013 and said it was truthful when she made it. But she did not remember whether she talked to Ford about the Schoberts before making her statement. The prosecutor then asked the following questions:

[MR. LOPRINZI (prosecutor)]: Do you remember reviewing your interview last night from back in April?

[HEATHER]: Yes.

[LOPRINZI]: Okay. And do you recall telling the detectives that you had a conversation with Mr. Ford about the Schoberts?

[HEATHER]: Yes.

[LOPRINZI]: All right. What conversation did you have with * * * Mr. Ford about the Schoberts back in—prior to their death?

[HEATHER]: I have no clue.

{¶ 220} Outside the jury's presence, the prosecutor stated his intention to impeach Heather, because he was "surprised" and "[i]t is a material issue in the case." The prosecutor told the court that Heather informed detectives that "she had a conversation with Mr. Ford in which he had talked about killing [Chelsea's] parents ever since Chelsea was injured because they were starting to piece things together." The prosecutor added that detectives had talked to Heather the previous day and played her recorded interview to her and that she recalled what she said in her statement. Defense counsel objected, stating that Heather's lack of memory was not grounds for turning her into a hostile witness. The trial court overruled that objection.

{¶ 221} While still outside the jury's presence, defense counsel objected that the prosecutors played the recorded interview in the courtroom where it was plainly audible to everyone. The defense stated that "it was unquestionably heard by Ms. Greathouse" and "this witness has now been irreparably tainted by having an opportunity to hear * * * a significant segment of her interview." The defense argued that she was now an incompetent witness. The prosecutor responded that Heather had listened to the recording the previous night and it did not matter if she heard it again. Moreover, the prosecutor did not think Heather heard the recording

when it was played in court, because "I couldn't hear it myself." The trial court overruled the defense objection.

{¶ 222} The prosecutor told the court that he was amenable to trying to refresh Heather's recollection before proceeding to impeach her. But defense counsel objected that the prosecutor had improperly refreshed her recollection outside the presence of counsel and the court. Heather told the court that she heard only "bits and pieces" of the recording that was played in the courtroom and that what she heard did not refresh her memory.

{¶ 223} Over defense objection, the state proceeded to impeach Heather by playing a portion of her videotaped interview with Hitchings for the jury. After the video was played, Heather said that she had not remembered what Ford told her about the Schoberts, because "[her] memory stinks." However, Heather stated that her recollection might be refreshed as to her conversation with Ford about Chelsea. Over defense objection and outside the jury's presence, Heather watched a segment of her videotaped interview to refresh her recollection.

{¶ 224} When questioning resumed before the jury, Heather testified that her memory had been refreshed about her conversation with Ford about Chelsea. She testified that Ford told her he stabbed Chelsea, hit her in the head with a brick, and would have killed her if Zachary had not intervened. Heather also testified that Ford told her that he was going to "hit a lick" and she told him "not to go kill them people." She said Ford was not home on the evening of April 1, but she saw him around noon the next day. She also identified the bloody pants that Ford "wore the night that he went and killed the Schoberts" and testified that she told her boyfriend to burn them. Heather added that Ford returned with two rings and some money.

### 2. Analysis

{¶ 225} Ford argues that the trial court erred by allowing the prosecutor to impeach Heather by playing her videotaped interview before the jury.

{¶ 226} Under Evid.R. 607(A), "[t]he credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage."

{¶ 227} Playing Heather's videotaped statement before the jury violated Evid.R. 607(A). First, the state used a statement that did not contradict her in-court testimony. Second, Heather did not cause affirmative damage by testifying "I have no clue" when asked about Ford's statement. Her response was neutral and provided no basis for impeachment. *See State v. Keenan*, 66 Ohio St.3d 402, 412, 613 N.E.2d 203 (1993); *State v. Hubbard*, 150 Ohio App.3d 623, 2002-Ohio-6904, 782 N.E.2d 674, ¶ 13 (7th Dist.) ("in determining affirmative damage, a response of 'I don't recall,' which is a neutral response, is not enough for damage. * * * Instead, the statement must be contradictory or harm[ ] the state's trial position").

{¶ 228} Furthermore, even if it had been proper for the state to impeach Heather's testimony, a prior inconsistent statement is admissible under Evid.R. 607 only to impeach the declarant and not as substantive evidence offered to prove the truth of the matter asserted. *McKelton,* 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 128; *State v. Dick*, 27 Ohio St.2d 162, 165, 271 N.E.2d 797 (1971). There was no other basis for presenting Heather's videotaped interview because it was otherwise objectionable hearsay. Accordingly, we conclude that Heather's videotaped interview was improperly presented for the jury's consideration.

{¶ 229} We now turn to whether Heather's videotaped interview was properly presented to refresh her recollection under Evid.R. 612.

{¶ 230} Under the doctrine of present recollection refreshed, "the witness looks at the memorandum to refresh his memory of the events, but then proceeds to testify upon the basis of his present independent knowledge." *State v. Scott*, 31 Ohio St.2d 1, 5-6, 285 N.E.2d 344 (1972). The testimony of the witness whose recollection has been refreshed is the evidence, not the contents of the writing. *See*

1 Giannelli, *Evidence,* Section 612.3, at 578 (3d Ed.2010). Thus, " 'a party may not read the statement aloud, have the witness read it aloud, or otherwise place it before the jury.' " *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 57, quoting *State v. Ballew*, 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996).

{¶ 231} The state could have refreshed Heather's recollection under Evid.R. 612 by showing her the videotaped interview outside the jury's presence. However, the prosecution did not present Heather's refreshed recollection testimony until *after* the videotaped interview had been improperly played in open court. Under Evid.R. 612, the party calling a witness may not present the matter used to refresh memory to be admitted as evidence unless that matter qualifies as independent evidence admissible under the hearsay rule. 1 Broun et al., *McCormick on Evidence*, Section 9, at 56 (7th Ed.2013). We hold that the trial court abused its discretion by allowing the prosecutor to present Heather's refreshed recollection testimony because a portion of the recording used to refresh Heather's memory was previously presented to the jury.

### 3. Harmless Error Beyond a Reasonable Doubt

{¶ 232} Ford argues that the improper admission of Heather's videotaped interview resulted in prejudice during both phases of the trial. The state responds that any error was harmless beyond a reasonable doubt.

{¶ 233} To determine whether an alleged error affected the substantial rights of the defendant and requires a new trial, "[t]he reviewing court must ascertain (1) whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict, (2) whether the error was not harmless beyond a reasonable doubt, and (3) whether, after the prejudicial error is excised, the remaining evidence establishes the defendant's guilt beyond a reasonable doubt." *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 50.

{¶ 234} We conclude beyond a reasonable doubt that Ford was not prejudiced by Heather's videotaped interview or her subsequent refreshed testimony and that the erroneous admission of that evidence had no impact on the verdict. The remaining evidence admitted at trial established Ford's guilt beyond any reasonable doubt. Most notably, DNA evidence linked him to the murders and he confessed to police that he was the killer.

{¶ 235} Based on the foregoing, we reject proposition of law No. X.

### H. Gruesome Photographs

{¶ 236} In proposition of law No. XI, Ford argues that the trial court erred in admitting gruesome crime-scene and autopsy photographs.

{¶ 237} A gruesome photograph is admissible only if its " 'probative value * * * outweigh[s] the danger of prejudice to the defendant.' " (Ellipsis and brackets sic.) *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 96, quoting *State v. Morales*, 32 Ohio St.3d 252, 258, 513 N.E.2d 267 (1987). Moreover, even a photo that satisfies the balancing test is inadmissible if it is repetitive or cumulative. *Id.; see State v. Thompson*, 33 Ohio St.3d 1, 9, 514 N.E.2d 407 (1987). A trial court's decision that a photo satisfies the standard is reviewable only for abuse of discretion. *See State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 69.

### 1. Crime-Scene Photos

{¶ 238} Ford complains about two exhibits presented during Gerring's testimony about discovering the bodies at the Schoberts' residence. State's exhibit No. 80 depicts a view of Margaret's body on the floor. State's exhibit No. 84 shows Jeffrey's body and the sledgehammer on the bed with Margaret's body on the floor next to the bed. Jeffrey's injuries cannot be seen but Margaret's head injuries are visible. These photos show the position of the bodies and the murder weapon when the bodies were found. *See State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548,

819 N.E.2d 1047, ¶ 85. Under these circumstances, we find no abuse of discretion in the admission of these photos.

{¶ 239} Ford also argues that the trial court erred in admitting five gruesome photographs of Margaret's body. State's exhibit No. 82 shows Margaret's body next to the dresser, but her head injuries are not prominently depicted. State's exhibit Nos. 91 and 124 show her outstretched arm near the blood-spattered dresser. Blood is visible next to the body, but these photos are not gruesome. *See State v. Smith*, 80 Ohio St.3d 89, 108, 684 N.E.2d 668 (1997) (photographs of bloodstains are generally not gruesome). Each photo was also relevant to show the direction of the blows causing the blood spatter. State's exhibit Nos. 93 and 97 are gruesome photos showing Margaret's head injuries. But we conclude that each photo was highly "probative of [the defendant's] intent and the manner and circumstances of the victims' deaths" and that the probative value of each outweighed the danger of unfair prejudice. *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 134.

{¶ 240} Finally, Ford argues that the trial court erred in admitting eight gruesome photographs of Jeffrey's body. State's exhibit No. 106 shows Jeffrey's body on the bed, next to the end table and the blood-spattered dresser, and state's exhibit No. 112 is a closer photo of the top half of his body. These photos, although gruesome, illustrate the testimony of the BCI analyst who processed the crime scene. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 98-99.

{¶ 241} State's exhibit Nos. 98 and 99 show Jeffrey's body next to the sledgehammer. These photographs are not particularly gruesome and were relevant in showing the location of the murder weapon. *See Trimble* at ¶ 135. State's exhibit Nos. 113, 115, 125, and 138 show different views of Jeffrey's bloody wrist and arms and close-up views of the sledgehammer. These photographs are somewhat cumulative but they are not gruesome. The mere fact that there are numerous

photographs does not result in prejudicial error, absent gruesomeness or shock value. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 232.

{¶ 242} Ford argues that the risk of undue prejudice was especially great because one news reporter became ill during the presentation of photographs during the state's opening statement. The trial court noted that "[w]e have learned * * * that she was otherwise ill even beyond the photographs. The photographs may have contributed, but she came to court not feeling well and suffered some kind of a consequence." Moreover, nothing shows that any of the jurors became ill or were unduly affected by seeing these photos.

{¶ 243} Ford cites *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 97-100, in arguing that too many photographs of the victims were admitted. In *Mammone*, the state presented two crime-scene photographs, showing a single photo of each child victim murdered in their car seats. *Id*. at ¶ 97. Over defense objection, the trial court admitted both photos. *Id*. We have "strongly caution[ed] judicious use" of gruesome photographs in capital cases. *Morales*, 32 Ohio St.3d at 259, 513 N.E.2d 267.

{¶ 244} The circumstances surrounding the Schoberts' murders are horrifying. We conclude that the trial court did not abuse its discretion by admitting the crime-scene photographs depicting the Schoberts. The probative value of the photographs outweighed the danger of prejudice.

2. Margaret's Autopsy Photos

{¶ 245} Ford argues that the trial court erred by admitting 14 autopsy photographs of Margaret. As an initial matter, Ford objects to state's exhibit Nos. 3 through 10 and 13. During trial, the defense stated that it had no objection to any of these exhibits, and hence Ford can complain only of plain error. *See Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 151; *Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, at ¶ 83.

**{¶ 246}** State's exhibit No. 3 is a nongruesome photograph showing a contusion on Margaret's shoulder and other injuries to her neck. State's exhibit Nos. 4 through 9 depict different views of the injuries to Margaret's head after the blood was removed. Although these photographs are gruesome, each of them supported Dr. Dean's testimony and provided a different perspective of the victim's wounds. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 142. State's exhibit No. 10 is another nongruesome photo showing a wound above Margaret's left ear. State's exhibit No. 13 shows two scratches on a finger, which was actually Jeffrey's. This photo is also not gruesome. No plain error resulted from the admission of any of these photos.

**{¶ 247}** State's exhibit No. 17 shows Margaret's body as she arrived at the medical examiner's office and shows injuries to the right side of her head. State's exhibit No. 18 shows a massive skull fracture, and state's exhibit No. 19 depicts injuries to her jaw and severe dental injuries. The number and location of the injuries were all probative evidence of a purpose to cause death. Each photo also supported and illustrated Dr. Dean's testimony about Margaret's wounds and the cause of her death. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 102.

**{¶ 248}** Ford argues, mistakenly, that state's exhibit Nos. 22 and 24 are gruesome photos depicting Margaret's battered head before her body was cleaned. These are photos of Jeffrey. Their admissibility will be discussed as it pertains to his autopsy photos.

**{¶ 249}** Finally, Ford argues that more autopsy photographs were admitted than in *Mammone*. But nothing in *Mammone* limits the number of noncumulative autopsy photographs that can be admitted if they are otherwise admissible.

**{¶ 250}** In summary, we find no plain error in the admission of the autopsy photos of Margaret.

### 3. Jeffrey's Autopsy Photos

{¶ 251} Ford also argues that the trial court erred by admitting eight autopsy photographs of Jeffrey.

{¶ 252} During trial, defense counsel stated that the defense had no objection to state's exhibit Nos. 34 and 37. Thus, Ford can complain only of plain error. State's exhibit No. 34 shows an incised wound on Jeffrey's torso and a side view of Jeffrey's head wounds. Although somewhat gruesome, we find no plain error in the admission of this photo. State's exhibit No. 37 is a nongruesome photo showing contusions on his left shoulder. We find that no plain error resulted from the admission of this photo.

{¶ 253} State's exhibit Nos. 38, 39, and 40 depict different views of the injuries to Jeffrey's head after the blood was removed. State's exhibit Nos. 41 and 42 show injuries to Jeffrey's upper and lower jaw. State's exhibit No. 44 shows a cutaway of the skull after the brain was removed and depicts fractured bone matter. These photos are gruesome. However, each of these photos illustrated Dr. Dean's testimony about Jeffrey's wounds and the cause of his death. *See Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 142. We hold that the prejudicial impact of these photos did not outweigh their probative value and the trial court did not abuse its discretion in admitting them.

{¶ 254} State's exhibit Nos. 22 and 24, which were mentioned earlier, are particularly gruesome photographs of the right and left side of Jeffrey's head when his body was brought to the medical examiner's office. The caked-on blood covering his face obscures any of his wounds. Defense counsel objected that the photographs were gruesome and cumulative. The trial court overruled the objection, noting that the judge in *Mammone* had admitted photos of children as they arrived at the coroner's office, still strapped in their car seats. The trial court added that the judge in *Mammone* also admitted additional photographs of the victims after their bodies were prepared for autopsy. The trial court "reached the

same conclusion" in admitting state's exhibit Nos. 22 and 24 "given the different things that are being depicted."

{¶ 255} Unlike in *Mammone*, state's exhibit Nos. 22 and 24 did not show different injuries from those depicted in other admitted photos. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 104 (each of seven autopsy photos, including the photo of a child still strapped to a car seat as she arrived at the coroner's office, presented a different injury). Thus, we agree that the trial court erred by admitting these cumulative photographs.

{¶ 256} Nevertheless, we hold that any error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 23-24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Mammone* at ¶ 106, fn. 5. The evidence that Ford murdered the Schoberts was overwhelming. Ford confessed to these crimes. DNA evidence on Ford's shoes also linked him to the murders.

{¶ 257} Although we find no abuse of discretion here, we caution trial courts to closely scrutinize the crime-scene and autopsy photos that are offered as exhibits in murder trials. The admission of gruesome photos exposes the jurors to horrific images, and when those photographs go to an element of the offense that is clearly proven by other evidence, they serve no useful purpose whatsoever. Instead, such exposure only serves to inflame the passions of jurors and risks subjecting them to harm. A few crime-scene photos showing the body along with the coroner's testimony will often suffice.

{¶ 258} Based on the foregoing, we reject proposition of law No. XI.

### I. Jury Issues

{¶ 259} In proposition of law No. VIII, Ford argues that the trial court erred by failing to conduct an investigation into alleged juror misconduct during deliberations.

1. Factual Background

{¶ 260} During voir dire, prospective juror No. 19[5] informed the court that she had interned with the Summit County Prosecutor's Office. Her affiliation with the prosecutor's office had ended, and she assured the court that her internship would not affect her ability to fairly consider the evidence in this case. She has paralegal and criminal-justice degrees. During individual voir dire, juror No. 19 was asked: "Do you think you would be bringing your own legal training to the case? Or could you leave that outside and just rely on the evidence that comes in through the court?" She responded, "Rely on the evidence." The defense later challenged juror No. 19 because she was a trained paralegal and used that experience in her job with the state. The trial court overruled that challenge.

{¶ 261} During Detective King's testimony, juror No. 19 informed the court that they attended the same church and that King was the bodyguard for the pastor's wife. Juror No. 19 stated that she did not know King and would not tend to favor King's testimony because of King's role in the church. The trial court overruled a defense motion to excuse juror No. 19 because of King's position at the juror's church.

{¶ 262} After trial-phase deliberations had begun, the jury foreman passed a note to the court asking: "For which of the 11 counts do we not have to all 12 agree on? If we can't come to an agreement (unanimous) ex. 11-1, do we consider not guilty?" The trial court advised the jury that a unanimous verdict must be reached as to all counts.

{¶ 263} At a sidebar, prosecutors informed the court that they had just learned that juror No. 19 was Facebook friends with the Summit County Prosecuting Attorney, Sherri Bevan Walsh, and three Summit County assistant prosecutors. Defense counsel requested that juror No. 19 be excused, and the trial

---

5. Prospective juror No. 19 became seated juror No. 5.

court agreed. During questioning before being excused, juror No. 19 acknowledged that she was Facebook friends with the Summit County Prosecuting Attorney and an assistant prosecutor. But she denied telling other jurors that she was Facebook friends with members of the prosecutor's office or that she had worked as an intern there.

{¶ 264} Defense counsel moved for a mistrial, arguing that juror No. 19 had deeply tainted the rest of the jury. In support of that argument, counsel suggested that the jury's question—about unanimity and "one person, because of her training," not agreeing with the rest—demonstrated juror No. 19's influence in the deliberations. The trial court interjected that the defense may be conflating two different questions that the jury had posed. In a separate question, the jury had asked:

> One of us feels that aggravated burglary is only about *taking something* when someone is present other than an accomplice. The rest of us think it is committing any criminal offense, trespassed by force, stealth or deception when another person is present other than an accomplice. Which is right? Most of us take the definition literally whereas the one girl's training makes her insist something had to be taken.

(Underlining sic.) The trial court stated, "That could have been this juror, we don't know."

{¶ 265} Defense counsel argued that "it is a reasonable assumption * * * that they are talking about the paralegal." Defense counsel added: "[T]hat's our juror that is holding out, that's the juror that is being problematic for these upcoming convictions * * *. And then, shortly thereafter, we are put in a position by the State revealing this information about * * * Facebook that forces us to * * *

ask whether we are going to bump off at our request the only person who may be a holdout for innocence."[6]

{¶ 266} In response, the prosecutor explained how they learned about the Facebook connection, stating that "earlier today, [the] bailiff called to advise that there was a question; there was an issue with the juror that we needed to come over for." The bailiff gave the assistant prosecutor the juror's name. The prosecutor then checked with colleagues in the office and learned that juror No. 19 was Facebook friends with some of the prosecutors.

{¶ 267} The trial court overruled the motion for a mistrial, stating that there is "no reason to think that the contact that Juror Number 19 * * * has had with Facebook friends, which she says she did not disclose to the rest of the jury, has in any way tainted the rest of the jury." The trial court added:

> On the issue of whether the State of Ohio brought this information [about Facebook] to light in order to achieve some tactical purpose, I interpret it a different way.
>
> The State of Ohio, as Mr. Gessner said, had some curiosity. The curiosity was addressed. Once the information became known, it was entirely proper to bring that information to light.

{¶ 268} As to the potential influence of juror No. 19 on the rest of the jurors, the trial court stated:

> The defense has no more reason to think than I do or anyone else does that this individual was or was not a holdout, because we do not know whether the jury went on to resolve whatever issue they

---

6. In proposition of law No. XX, Ford argues that defense counsel provided ineffective assistance of counsel by requesting that juror No. 19 be excused, because it was likely she was a holdout juror.

may have had with respect to the aggravated burglary count. We do not know, nor will we know, what prompted the most recent question which raised the issue of something being 11 to 1.

## 2. Analysis

### a. Outside influence during deliberations

{¶ 269} Ford argues that juror No. 19 used her background as a paralegal to influence other jurors to disregard the trial court's instructions and apply her own legal definitions. Ford contends that the jury's questions about aggravated burglary and unanimity of the verdicts show that juror No. 19 was interjecting outside information that was inconsistent with the trial court's instructions. He argues that this was an outside influence that the trial court failed to investigate.

{¶ 270} Ohio law prohibits outside influences, if they are shown to be prejudicial. *State v. Kehn*, 50 Ohio St.2d 11, 18-19, 361 N.E.2d 1330 (1977).

> Any communication or contact outside the courtroom or jury room about the matter at trial between a juror and another person, particularly if connected with one of the parties to the litigation, and any independent inquiry or experiment by a juror about the evidence or the law, violate the juror's duty to limit his considerations to the evidence, arguments and law presented in open court. Any such activity is juror misconduct, a constitutional violation whether viewed under the Fourteenth Amendment to the United States Constitution or Section 10, Article I of the Ohio Constitution.

*State v. King*, 10 Ohio App.3d 161, 165, 460 N.E.2d 1383 (1st Dist.1983).

{¶ 271} Ford's argument fails for several reasons. First, he fails to establish that juror No. 19 said anything during deliberations that caused the jury to disregard

the trial court's instructions. The fact that the foreman sought clarification about juror unanimity and the definition of aggravated burglary does not show that the juror was trying to undermine such instructions. At about the same time, the prosecutor disclosed that juror No. 19 was Facebook friends with members of the prosecutor's office. Nothing shows that the two events were related. Moreover, juror No. 19 was excused, an alternate juror took her place, and deliberations began anew. Thus no prejudice occurred. *See State v. Hipkins*, 69 Ohio St.2d 80, 83, 430 N.E.2d 943 (1982) (judgment will not be reversed because of juror misconduct unless prejudice is shown); *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (party complaining about juror misconduct must prove prejudice).

**{¶ 272}** Second, even assuming that juror No. 19 interjected her legal experience into the deliberative process, nothing shows that this was an improper "outside influence" on the deliberations. Ford does not claim that she consulted legal texts, checked the internet, or spoke to a lawyer and conveyed such information to the other jurors. Nor does he claim that juror No. 19 paraded her paralegal background before the other jurors or gave legal directives. Here, the juror's personal experiences, including her paralegal experience, do not constitute an outside influence. *See Tanner v. United States*, 483 U.S. 107, 117-119, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987); *State v. Hughes*, 7th Dist. Mahoning No. 02CA15, 2003-Ohio-6094, ¶ 28.

**{¶ 273}** In examining a claim that a juror had improperly used her engineering and mathematics background, the Supreme Court of Colorado stated that "[t]he line between a juror's application of her background professional and educational experience to the record evidence and a juror's introduction of legal content or specific factual information learned from outside the record can be a fine one." *Kendrick v. Pippin*, 252 P.3d 1052, 1066 (Colo.2011). But "[t]he test requires that the experience used by the juror in deliberations be part of the juror's

background, gained before the juror was selected to participate in the case and not as the result of independent investigation into a matter relevant to the case." *Id*. A similar analysis applies here. Further, "a majority of courts have held that a juror's intradeliberational statements, when based on personal knowledge and experience do not constitute extraneous prejudicial information." *Id.* at 1065. Thus, we reject Ford's claim that juror No. 19 interjected an "outside influence" during deliberations.

{¶ 274} Ford argues that the trial court should have conducted a hearing to determine the extent of the outside influence and prejudice. In *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the United States Supreme Court held that a trial court confronted with an allegation of external tampering or contact with a juror during trial about a matter pending before the jury "should determine the circumstances, the impact [of the circumstances] upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id*. at 230.

{¶ 275} Nonetheless, "not all communications with jurors warrant a hearing for a determination of potential bias." *White v. Smith*, 984 F.2d 163, 166 (6th Cir.1993). An allegation of an unauthorized communication with a juror requires a *Remmer* hearing only when the alleged contact presents a likelihood of affecting the verdict. *See United States v. Frost*, 125 F.3d 346, 377 (6th Cir.1997).

{¶ 276} We hold that the trial court did not err by failing to conduct a *Remmer* hearing, because Ford presented no basis upon which to believe that juror No. 19 had introduced an "outside influence" into the proceedings. Juror No. 19 also assured the court that she had not told other jurors that she was Facebook friends with members of the prosecutor's office or had worked as an intern there.

{¶ 277} Next, Ford argues that juror No. 19 tainted the jury. However, "[s]peculation and unsubstantiated allegations do not present a colorable claim of

outside influence of a juror." *See United States v. Wintermute*, 443 F.3d 993, 1003 (8th Cir.2006).

{¶ 278} As a final matter, Ford claims that by excusing juror No. 19, the trial court sent a message to other jurors that a holdout would not remain on the jury. But the trial court told the jury: "I wanted to advise the members of the jury that for a reason that has nothing to do with your deliberations in the case or the facts of the case, but, instead, on some information the Court became aware of that is not a matter for your concern, the Court did find it necessary to excuse [juror No. 19] from further jury service on this case." These instructions addressed any lingering concerns about juror No. 19's removal. *See State v. Jones*, 91 Ohio St.3d 335, 344, 744 N.E.2d 1163 (2001) (jury presumed to have followed trial court's instructions).

{¶ 279} Furthermore, *Ford requested* that juror No. 19 be removed from the panel. The doctrine of invited error specifies that a litigant may not "take advantage of an error which he himself invited or induced." *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co., Lincoln-Mercury Div.*, 28 Ohio St.3d 20, 502 N.E.3d 590 (1986), paragraph one of the syllabus. "This court has found invited error when a party has asked the court to take some action later claimed to be erroneous, or affirmatively consented to a procedure the trial judge proposed." *State v. Campbell*, 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000). Here, defense counsel requested that juror No. 19 be removed from the panel and is not entitled to complain of an error that counsel requested. Accordingly, we reject this claim.

*b. Bailiff's discussions with the prosecutor*

{¶ 280} Ford argues that the trial court erred by not conducting a hearing under *Remmer*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654, to address the bailiff's communications with the prosecutor about an issue with a juror. He argues that these communications violated the secrecy of the jury deliberations.

{¶ 281} It is unclear what the bailiff told the prosecutor, beyond stating that there was "a question; there was an issue with the juror that we needed to come over for." After they talked, the prosecutor learned that juror No. 19 was Facebook friends with members of the prosecutor's office.

{¶ 282} There is no evidence that the bailiff had a conversation with the juror that affected the verdict—all the bailiff did was tell the prosecutor that there was an "issue" with a juror and gave him the juror's name. Thus, we conclude that the trial court did not err by failing to conduct a *Remmer* hearing regarding this matter.

{¶ 283} Based on the foregoing, we reject proposition of law No. VIII.

*J. Juror Misconduct During Deliberations*

{¶ 284} In proposition of law No. IX, Ford argues that juror misconduct during deliberations violated his right to a fair trial and fair sentencing proceedings.

1. Factual Background

*a. Juror No. 19*

{¶ 285} On October 28, 2014, during the mitigation phase, the *Akron Beacon Journal* published an interview with juror No. 19, who had already been excused. According to the newspaper article, she stated that other jurors were in a hurry to convict Ford without conducting much debate. She said one juror had talked about the need to reach a verdict in time to attend an upcoming birthday party. Juror No. 19 added, "I was a roadblock to them getting out," and "I was the only one trying to fight and take a look at what was going on."

{¶ 286} Juror No. 19 stated that some jurors, despite instructions to the contrary, talked about potential penalties. They mentioned the likelihood that Ford would never get out of prison if convicted of aggravated murder or would not face execution any time soon if the jury voted for the death penalty. She stated that some jurors relied on her legal experience to ask basic questions but then pressured her to convict Ford, calling her positions "crazy" and not worthy of debate.

{¶ 287} Juror No. 19 stated that she had originally signed the guilty form for aggravated murder but changed her mind after a night being sequestered. She did not believe that Ford went to the Schoberts' home on April 2, 2013, with the intent to kill. She also did not believe that Ford and his codefendant, Vaughn, walked nine miles from Akron to the Schoberts' home in New Franklin. She said that a second juror appeared to be agreeing with her.

{¶ 288} She said that others were not agreeing and there was "shouting at times." Juror No. 19 got into a "real blow up" with another juror, because she was making snide remarks about her being a paralegal. Juror No. 19 added, "It was me and [a second juror] and they kept saying are we crazy."

{¶ 289} Unbeknownst to juror No. 19 at the time, the foreperson sent notes to the court asking about jury unanimity and the burglary charge. She said that this led the prosecutors to search her Facebook page and learn that she was "friends" with members of the prosecutor's office. She said the decision to excuse her was shocking and likely fueled by the tone of the foreperson's notes to the judge.

*b. Juror No. 46*

{¶ 290} On November 2, 2014, just days after the jury had been excused, the *Akron Beacon Journal* published an interview with juror No. 46, a seated juror during both phases of the trial. Juror No. 46 said she was the lone holdout for a life sentence. She said, "I didn't want the death penalty at all. I fought for hours. I had one juror get in my face saying, 'I can't believe you wouldn't give this kid the death penalty. What's wrong with you * * *.' " She added, "Yes, [I was intimidated]. * * * I don't feel a death sentence is right for Shawn." (Brackets sic.)

{¶ 291} Juror No. 46 said she was initially the only person to vote against death for Jeffrey's murder. Pressure to vote for death for Margaret's murder intensified. She relented and signed a death sentence for Margaret's murder while the other jurors agreed to a life sentence for Jeffrey's murder. But she said, "I didn't

want to sign it, and I think now I'm going to have to live with that guilt * * * I don't feel it was the right thing to do."

{¶ 292} Juror No. 46 said she considered changing her vote when the jurors were polled. She said, "I wanted to say no, but I couldn't. I was looking down. I was shaking. I couldn't even control myself. But I said yes." Juror No. 46 stated that she surrendered her position "[b]ecause of how awful [the other jurors] were."

{¶ 293} She said deliberations during the trial phase were swift and most jurors had no interest in deliberating. The same haste occurred during sentencing. Some jurors arguing for death expressed concern that Ford, if given life in prison, could one day escape. One juror cited the Chardon school shooter and his recent escape as an example. She added, "They were screaming at me. It wasn't pleasant behind the scenes with these people."

### c. Motion for a Remmer hearing denied

{¶ 294} Following the publication of juror No. 46's interview, defense counsel filed a motion for a hearing under *Remmer*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654, to address the juror misconduct reported in the *Akron Beacon Journal*. The trial court denied the motion, stating that "there is no evidence before the court suggesting that the jury * * * was improperly influenced by anyone or anything outside of the jury." The trial court added that "because defendant's motion is based on newspaper articles related entirely to the deliberations of the sequestered jury and there is no evidence *aliunde* suggesting juror misconduct, the court would not be permitted to hear testimony from these former jurors on the subject upon which defendant's motion is based."

### 2. Analysis

{¶ 295} Evid.R. 606(B), also known as the aliunde rule, governs the competency of a juror to testify at a subsequent proceeding concerning the verdict. It states:

**(B) Inquiry Into Validity of Verdict or Indictment**.  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.  A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented.  However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court.  A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying will not be received for these purposes.

(Boldface sic.)

{¶ 296} The purpose of the aliunde rule is to maintain the sanctity of the jury room and the deliberations therein, ensure the finality of jury verdicts, and protect jurors from being harassed by defeated parties.  *See State v. Hessler*, 90 Ohio St.3d 108, 123, 734 N.E.2d 1237 (2000); *State v. Reiner*, 89 Ohio St.3d 342, 350, 731 N.E.2d 662 (2000).

{¶ 297} The trial court did not err in refusing to hold a *Remmer* hearing to consider evidence from juror No. 19 or juror No. 46 about the deliberations.  We addressed a similar claim in *Hessler*.  In that case, a distraught juror complained to the trial judge about her treatment from fellow jurors.  *Hessler* at 116-120.  The

defense argued that the juror's statement showed that she wanted to vote for life sentences but was unfairly coerced and pressured to vote for death. The defendant claimed that he was denied the right to a fair and impartial jury because of jury misconduct. *Id*. at 120. We rejected that claim, stating:

> "The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen v. United States* (1896), 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528, 531. The requirement of a unanimous decision, however, does not come without a price. Heightened emotions and intense feelings are part and parcel of this process. Experience tells us that during deliberations, it is not unusual to find heavy-handed influencing, browbeating, and even bullying to a certain extent. For always there is the possibility that "articulate jurors may intimidate the inarticulate, the aggressive may unduly influence the docile." *People v. DeLucia* (1967), 20 N.Y.2d 275, 278, 282 N.Y.S.2d 526, 529, 229 N.E.2d 211, 213.

*Id*.

{¶ 298} *Hessler* applies to the allegations of misconduct that juror Nos. 19 and 46 reported against other jurors. Evid.R. 606(B) prohibited the trial court from questioning these jurors about what occurred during deliberations that might have affected the jurors' minds or emotions in the process once the final verdict was rendered. Thus, a *Remmer* hearing was not required.

{¶ 299} Moreover, juror No. 19 was excused before the trial-phase deliberations were completed and would not have known what happened in the jury room after she was replaced. And juror No. 46 confirmed her verdict in open court when the jury was polled. "The function of the poll is 'to enable the court and the

parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented.' " *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 37, quoting *Miranda v. United States*, 255 F.2d 9, 17 (1st Cir.1958). Once polling has been completed and all have assented to the verdict, "a juror may not thereafter rescind or modify his or her vote." *Williams* at ¶ 38.

{¶ 300} Ford raises *Peña-Rodriguez v. Colorado*, __ U.S. __, 137 S.Ct. 855, 197 L.Ed.2d 107 (2017), in arguing that the behavior of certain jurors during deliberations denied him a fair and impartial jury. The Supreme Court held in *Peña-Rodriguez* that the traditional "no-impeachment rule" codified in Fed.R.Evid. 606(b) may violate the Sixth Amendment right to an impartial jury when "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Id*. at ___, 137 S.Ct. at 869. In such cases, a court may decline to apply the no-impeachment rule, consider jury testimony, overturn a jury verdict, and hold a new trial. *See id*. Unlike in *Peña-Rodriguez*, neither juror No. 19 nor juror No. 46 indicated that racial bias or hostility was exhibited during the deliberations. Thus, *Peña-Rodriguez* does not overcome the no-impeachment rule here.

{¶ 301} Ford also cites *Warger v. Shauers*, 574 U.S. 40, 135 S.Ct. 521, 190 L.Ed.2d 422, (2014), in arguing that in extreme cases of juror bias, applying Evid.R. 606(B) to bar juror testimony proving such bias would run afoul of the Sixth Amendment. *Warger* held that Fed.R.Evid. 606(b) *applies* to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during voir dire. *Id*. at 44. Ford relies on a footnote in *Warger*, in which the court said:

> There may be cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged. If and when such a

case arises, the Court can consider whether the usual safeguards are or are not sufficient to protect the integrity of the process. We need not consider the question, however, for those facts are not presented here.

*Id*. at 51, fn. 3.

{¶ 302} The Supreme Court decided *Peña-Rodriguez* a little more than two years later. As discussed, however, *Peña-Rodriguez* limited the exception to the no-impeachment rule to a situation in which "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *See Peña-Rodriguez* at ___, 137 S.Ct. at 869. *Warger* does not apply here.

{¶ 303} Based on the foregoing, we reject proposition of law No. IX.

*K. Limitations on Defense Closing Arguments*

{¶ 304} In proposition of law No. XVI, Ford argues that the trial court erred in sustaining a series of objections to defense counsel's closing arguments.

{¶ 305} First, Ford argues that the trial court erred in sustaining an objection to a comment that called into question the extent of the state's investigation:

MR. SINN [(defense counsel)]: And, again, when you make decisions here, you have a right to have the investigation that you need to make the decisions to let you know what happened. You don't have to put the pieces together. * * * That's the * * * job of the New Franklin Police Department. And if they are not up to doing it, then they need to get somebody else out there.

MR. LOPRINZI [(prosecutor)]: Objection.

THE COURT: Sustained.

{¶ 306} Both parties are given latitude during closing arguments to address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *See Loza*, 71 Ohio St.3d at 78, 641 N.E.2d 1082. As one court explained:

> Trial counsel may advocate and persuade to the limit of his or her ability and enthusiasm but cannot misrepresent evidence or go beyond the limits set by the trial court. Thus, counsel may freely discuss the facts, arraign the conduct of parties, impugn, excuse, justify or condemn motives according to the evidence, and attack the credibility of witnesses when the record supports the same. The court should not be severe in arresting argument on the ground that the argument or inference is illogical.

(Internal citations omitted.) *State v. Powell*, 177 Ohio App.3d 825, 2008-Ohio-4171, 896 N.E.2d 212, ¶ 45 (4th Dist.).

{¶ 307} Leading up to the objected-to comments, defense counsel argued that the police had failed to prove that Zachary was out of town at the time of the murders. The defense also argued that the police failed to identify any witnesses who saw Ford and Vaughn walking in the middle of the night from Akron to the Schoberts' house in New Franklin. The defense argument aimed at the New Franklin Police Department was a means of questioning why the prosecution lacked more evidence. We hold that the trial court erred in prohibiting such argument.

{¶ 308} Second, Ford argues that the trial court erred by sustaining an objection to a defense argument about the prosecution's failure to call Detective Morrison as a witness. During closing argument, defense counsel argued:

Over two days, there are multiple statements given, six or seven different statements. At first, Shawn Ford denies involvement, and then he talks about other people being involved. And, each time, Detective Hitchings or Detective Morrison—who, again, we don't hear from Detective Morrison—

MR. LOPRINZI: Objection.

THE COURT: Sustained.

**{¶ 309}** A party's failure " 'to call a witness who has some knowledge of the matter under investigation may be commented upon.' " *State v. D'Ambrosio*, 67 Ohio St.3d 185, 193, 616 N.E.2d 909 (1993), quoting *State v. Petro*, 148 Ohio St. 473, 498, 76 N.E.2d 355 (1948). Morrison did not testify during trial even though he played a key role in the investigation of Chelsea's assault and interviewed Ford on April 2 and 3. Thus, defense counsel's comment about not hearing from Morrison during trial should have been allowed.

**{¶ 310}** The state cites Crim.R. 16(I) in arguing that the defense does not have a "freewheeling right to comment on the absence of any person who that party thinks should have testified." But Crim.R. 16(I) provides:

**(I) Witness List.** Each party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal. The content of the witness list may not be commented upon or disclosed to the jury by opposing counsel, *but during argument, the presence or absence of the witness may be commented upon*.

(Emphasis added and boldface sic.)  Nothing in Crim.R. 16(I) prohibited defense counsel from commenting on Morrison's absence; indeed, the rule expressly permits such comment.  Thus, we conclude that the trial court erred in sustaining an objection to the defense argument.

{¶ 311} We conclude, however, that the two erroneous rulings were harmless beyond a reasonable doubt.  *See Chapman*, 386 U.S. at 23-24, 87 S.Ct. 824, 17 L.Ed.2d 705; *Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, at ¶ 50.  There is little likelihood that the restrictions on defense counsel's argument affected the verdict in view of DNA evidence linking Ford to the murders and his confession.

{¶ 312} Finally, Ford argues that the trial court erred in curtailing the defense argument that questioned the completeness of Ford's police interview.  Defense counsel argued:

What else did he say?  I mean, really, what else did he say?  You have got him saying—you have got him now opened up, confessing.  What else did Shawn say?  * * *  Where is the rest of the information?

Where are the cell phones?  Where are Jeff and [Margaret's] cell phones?  That's important.  We don't know where those phones went.  Why don't we know that?

I mean, if, according to Hitchings, Shawn has now come clean and telling the truth of the story, that's when you ask him all the questions you want to ask.  That's when you get all the answers out.

The prosecutor objected and, outside the jury's presence, argued that defense counsel "knows the answers to these questions.  He knows his client was asked

these questions."  The trial court sustained the objection, stating that counsel "cannot imply that some work was not done that was done.  * * *  I will instruct counsel not to continue with that."

{¶ 313} Ford's recorded interview showed that he told police that Vaughn had both of the Schoberts' phones.  Thus, the trial court could prohibit defense counsel from arguing that Ford was not asked about the phones when they knew that he had been asked.  *See State v. Sibert*, 98 Ohio App.3d 412, 426-427, 648 N.E.2d 861 (4th Dist.1994) (defense not permitted to argue that the state failed to call victim's father when counsel agreed that the victim's father could not testify).

{¶ 314} Based on the foregoing, we reject proposition of law No. XVI.

*L. Sufficiency and Manifest Weight of the Evidence*

{¶ 315} In proposition of law No. XII, Ford challenges the sufficiency of the evidence for his convictions for (1) aggravated murder with prior calculation and design, (2) aggravated murder during an aggravated robbery, the aggravated-robbery death-penalty specifications, and the separate aggravated-robbery offense, (3) aggravated murder during an aggravated burglary and the separate aggravated-burglary offense, and (4) grand theft.  He also challenges his conviction for the felonious assault of Chelsea as against the manifest weight of the evidence.

1. Aggravated Murder with Prior Calculation and Design

{¶ 316} Ford argues that there is insufficient evidence of the element of prior calculation and design to support his convictions for the aggravated murders of Jeffrey (Count 1) and Margaret (Count 4).  Ford also challenges his convictions for committing aggravated murder with prior calculation and design in the two death-penalty specifications attached to Count 4.

{¶ 317} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492

(1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 318} Ford claims that there is insufficient evidence of prior calculation and design because it is just as likely that he went to the Schoberts' home to break in and rob the Schoberts while they were at the hospital. He argues that he did not bring a weapon to the house but used a knife and a sledgehammer obtained from the Schoberts' home.

{¶ 319} "The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18. There is no bright-line test to distinguish between the presence or absence of prior calculation and design; each case depends upon its own facts. *Id*. at ¶ 19. Three factors have traditionally been considered in determining whether prior calculation and design exists: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?' " *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

{¶ 320} There is sufficient evidence in this case for any rational trier of fact to find that Ford killed Jeffrey and Margaret with prior calculation and design. First, Ford knew the Schoberts and knew that they did not want him to see Chelsea in the hospital. Ford also knew that the story he had told police about Chelsea's assault was falling apart. Second, despite Ford's assertion that he planned only to steal from the Schoberts and that he went to the Schoberts' house without a weapon, there is sufficient evidence that he had decided to kill them. Regarding the murder of Jeffrey, the evidence shows that Jeffrey was in bed when Ford arrived at the Schoberts' home. There is no evidence of a struggle or confrontation between Ford and Jeffrey. Ford admits he took a sledgehammer from the Schoberts' garage, went

upstairs to the bedroom, and killed Jeffrey by hitting him in the head, at least 14 times according to the coroner.

{¶ 321} There is also sufficient evidence of prior calculation and design for the aggravated murder of Margaret (Count 4). After killing Jeffrey, the evidence suggests that Ford waited at the house for Margaret to come home. During this time Ford or Vaughn used Jeffrey's phone, pretending to be Jeffrey, to determine when Margaret would be coming home.

{¶ 322} At trial, the state introduced text messages that were exchanged between Jeffrey's phone and Margaret's phone during the early morning of April 2, 2013:

[03:58:19: (Jeffrey)] you still at hospital

* * *

[04:57:59: (Margaret)] Have u been up all night

[04:59:26: (Jeffrey)] yea

[05:00:10: (Jeffrey)] How Chelsea doin

[05:09:00: (Jeffrey)] What time you coming home

[05:12:25: (Margaret)] Who is at the house

[05:14:30: (Jeffrey)] Just me i know you called but my phone not working right now i dobt know why

[05:16:26: (Margaret)] we have been up since 4. * * * She is crying bc she can't eat cereal and wants to see shawn

[05:17:49: (Jeffrey)] Is you go let her see him

[05:17:53: (Margaret)] Her throat is hurting. * * * She says she is 18 and can do what she wants

[05:18:15: (Margaret)] Is this Shawn

* * *

[05:19:11: (Jeffrey)] I hate that asshole

[05:20:21: (Margaret)] What is going on

* * *

[05:22:12: (Jeffrey)] I'm about to go to bed i been up all night but what time you coming

[05:22:53: (Margaret)] Why were u up all night

* * *

[05:24:45: (Jeffrey)] I was watching TV and i was studying my case

[05:25:10: (Margaret)] why do u want to know when I am coming

[05:27:19: (Jeffrey)] Because I'm probably go be sleep when you get here just asking

[05:29:35: (Jeffrey)] Goodnight hun

[05:30:09: (Margaret)] I can't deal w lies anymore

[05:31:06: (Jeffrey)] What are you talking about

{¶ 323} Despite Margaret's suspicions that it was Ford and not Jeffrey who was texting her, Margaret did not call the police and went home alone. The evidence suggests that Ford and Vaughn had been in the home for hours, lying in wait for her arrival, and attacked her with the sledgehammer when she walked into the bedroom. She was hit in the head at least 19 times. Regardless of Ford's claim that he arrived at the Schoberts' home without a weapon and regardless of his claim that his original plan was only to steal from the Schoberts, there is sufficient evidence for any rational trier of fact to find beyond a reasonable doubt that after Ford arrived at the Schoberts' home, he decided to kill them.

{¶ 324} Accordingly, we conclude that there was sufficient evidence to establish that Ford acted with prior calculation and design in killing Jeffrey and Margaret.

2. Aggravated Murder during Aggravated Robbery

{¶ 325} Ford argues that the evidence does not support his convictions for aggravated murder during an aggravated robbery (Counts 2 and 5), the death-penalty specifications for committing aggravated murder while committing aggravated robbery, and the aggravated-robbery offenses (Counts 6 and 7). He contends that there was no evidence that he committed theft or knew that a theft was committed. These claims lack merit.

{¶ 326} R.C. 2903.01(B), Ohio's felony-murder statute, reads:

(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, *aggravated robbery*, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

(Emphasis added.)

{¶ 327} The capital specification, R.C. 2929.04(A)(7), sets forth the criteria for imposing death or imprisonment for aggravated murder during an aggravated robbery:

(A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:

* * *

(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, *aggravated robbery*, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

(Emphasis added.)

{¶ 328} R.C. 2911.01 sets forth provisions of the aggravated-robbery statute:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

{¶ 329} Heather Greathouse testified that before the murders, Ford said he was going to "hit a lick." After the murders, he returned with two rings and some money. Heather's aunt threw the rings in a nearby dumpster. The police later recovered the rings, and Chelsea identified one of the rings as her mother's. Ford also admitted to police that someone took money and jewelry from the Schoberts' home. Thus, we hold that there was sufficient evidence to establish Ford's guilt of

aggravated murder during an aggravated robbery, the related aggravated-robbery death-penalty specifications, and the robbery offenses themselves.

### 3. Aggravated Murder during Aggravated Burglary

**{¶ 330}** Ford argues that the evidence is insufficient to support his convictions for committing aggravated murder during an aggravated burglary (Counts 3 and 6) and the separate aggravated-burglary offense (Count 8) because the state failed to prove that someone was likely to be home at the time of the offenses.

**{¶ 331}** The aggravated-burglary statute, R.C. 2911.11, provides:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another * * *.

**{¶ 332}** "Occupied structure" is defined in R.C. 2909.01:

(C) "Occupied structure" means any house, building, outbuilding, watercraft, aircraft, railroad car, truck, trailer, tent, or other structure, vehicle, or shelter, or any portion thereof, to which any of the following applies:

* * *

(4) At the time, any person is present or likely to be present
in it.

(Emphasis added.)

{¶ 333} The state charged Ford with aggravated burglary under R.C. 2911.11(A), which requires that a "person other than an accomplice of the offender [*was*] *present*." (Emphasis and brackets added.) The evidence showed that Jeffrey was at home at the time of the aggravated burglary. Thus, the state did not need to also prove the likelihood that Jeffrey or Margaret would be present.

{¶ 334} Ford cites *State v. Fowler*, 4 Ohio St.3d 16, 445 N.E.2d 1119 (1983), in arguing that the state needed additional proof that Jeffrey or Margaret were "likely to be present." The aggravated burglary in that case occurred when no one was home. Under those circumstances, which are not applicable here, this court held that "proof that a permanent or temporary habitation or dwelling has been burglarized is alone insufficient to establish the fourth element necessary to support a conviction for aggravated burglary, *i.e.,* that the occupied structure is one at the time of the trespass in which any person is present or likely to be present." *Id*. at 18. Thus, *Fowler* is inapposite.

{¶ 335} We hold that there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Ford was guilty of the two counts of aggravated murder during an aggravated burglary and of the separate aggravated-burglary offense.

4. Grand Theft

{¶ 336} Ford argues that there is insufficient evidence to support his conviction for the grand theft of Jeffrey's automobile (Count 9) because there is no proof that he exerted control over the vehicle.

{¶ 337} Jeffrey's automobile was missing from his home when the murders were discovered. Based on information that Ford provided to inmate Beech, the

police located Jeffrey's car a short distance from where Vaughn was staying. A search of nearby drains uncovered gloves, a knife, and a stocking hat. The BCI forensic scientist determined that Ford could not be excluded as a contributor to the DNA found on the stocking hat.

{¶ 338} "Grand theft requires one to obtain or exert control over property of another." *State v. Talley*, 18 Ohio St.3d 152, 155, 480 N.E.2d 439 (1985). Ford argues that the state failed to prove that Ford took or drove Jeffrey's automobile. It is unclear whether Ford or Vaughn drove the car. But evidence shows that Ford was in the car. He told Beech where the car could be found. Evidence linking Ford to the murders was also found in the area near the car. Thus, even assuming that Ford was not the driver, we conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that Ford committed grand theft as an aider or abettor.

### 5. Felonious Assault of Chelsea

{¶ 339} Ford contends that his conviction for the felonious assault of Chelsea (Count 11) is against the manifest weight of the evidence. He argues that Joshua, Zachary, and Chelsea picked someone besides Ford from the photo lineup as the assailant. Ford also mentions that Joshua and Zachary provided inconsistent accounts of what happened.

{¶ 340} When reviewing a claim that a jury verdict is against the manifest weight of the evidence, an appellate court must apply the following test:

"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised

only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 341} Evidence shows that on March 23, 2013, Ford attacked Chelsea in a bedroom at Zachary's residence. According to Chelsea, Ford wanted to have sex, but she asked him to wait. Ford then hit her in the head with a brick and stabbed her in the neck and back. Following the attack, Ford told Joshua not to tell the truth. He also told Zachary to tell the police that Chelsea was assaulted by some guys at a party in Kent. Chelsea testified that she was initially scared to tell the truth: "I thought if he would have found out, then I would be in worse condition than I already was." Heather testified that Ford told her that he "stabbed [Chelsea] and he hit her upside the head with a brick," because "she wasn't paying attention to him." Ford "ultimately admitted" to detectives that "he did this to Chelsea." Given the strength of the trial testimony and Ford's own admissions, we conclude that Ford's felonious-assault conviction is supported by the manifest weight of the evidence.

{¶ 342} Based on the foregoing, we reject proposition of law No. XII.

*M. Conflicting Verdicts*

{¶ 343} In proposition of law No. II, Ford argues that the jury returned conflicting verdicts on the R.C. 2929.04(A)(7) death-penalty specifications in the counts for the aggravated murder of Margaret. Because Ford did not object to this alleged error at trial, he forfeited all but plain error. *See Ballew*, 76 Ohio St.3d at 251, 667 N.E.3d 369.

{¶ 344} The jury found Ford guilty of the aggravated murder of Margaret with prior calculation and design, R.C. 2903.01(A) (Count 4), and the aggravated murder of Margaret during an aggravated robbery, R.C. 2903.01(B) (Count 5).

Both counts contained identical R.C. 2929.04(A)(7) specifications.[7] The jury also found Ford guilty of "prior calculation and design" in Specifications 2 and 3 of Count 4. However, he was found guilty as the "principal offender" in Specifications 2 and 3 of Count 5.

{¶ 345} Prior to the mitigation phase, at the request of both parties, the trial court merged Count 3, to the extent that it related to Margaret, Count 4, and Count 5 into Count 4. Count 4 and the accompanying aggravating-circumstances specifications for the killing of two or more people and the commission of an aggravated murder with prior calculation and design were submitted to the jury in the sentencing phase.

{¶ 346} Ford complains that the verdicts in Counts 4 and 5 are conflicting. First, he argues that the state should not have been allowed to charge both that Ford acted as the principal offender (i.e., the actual killer) or, if not the principal offender, that he acted with prior calculation and design. However, Ford acknowledges in his reply brief that the prior-calculation-and-design and the principal-offender elements of R.C. 2929.04(A)(7) may be charged disjunctively. The analysis in Ford's reply brief reflects the proper standard of law. *See State v. Cook*, 65 Ohio St.3d 516, 527, 605 N.E.2d 70 (1992) (trial court may instruct the jury on prior-calculation-and-design and principal-offender status disjunctively in the same specification).

{¶ 347} Second, Ford argues that the trial court erred by accepting conflicting verdicts in Counts 4 (i.e., murder with prior calculation and design) and 5 (i.e., murder as the principal offender). However, the verdicts involved separate counts. And as we have stated, " 'The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does

7. Count 3 charged Ford with the aggravated murder (aggravated burglary) of Jeffrey or Margaret. Specifications 2 and 3 under Count 3 were the same as the specifications underlying Counts 4 and 5. The jury also found Ford guilty of Count 3 and guilty as the "principal offender" under Specifications 2 and 3.

not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count.' " *State v. Adams*, 53 Ohio St.2d 223, 374 N.E.2d 137 (1978), paragraph two of the syllabus. Moreover, the trial court's merger of the convictions ensured that the murder of Margaret with prior calculation and design was the only count with R.C. 2929.04(A)(7) specifications that was submitted for the jury's consideration for sentencing.

{¶ 348} Third, Ford cites *State v. Penix*, 32 Ohio St.3d 369, 371, 513 N.E.2d 744 (1987), in arguing that the alternative specifications should not have been submitted to the jury. *Penix* held that it is error for a trial court to allow the jury to consider prior calculation and design together with principal-offender status as separate aggravating circumstances. *Id*. However, the present case differs from *Penix* in that the prior-calculation-and-design and the principal-offender elements of R.C. 2929.04(A)(7) were charged disjunctively to the jury in a single specification. Thus, Ford's claim that there was a *Penix* violation lacks merit. *See Cook* at 527.

{¶ 349} Fourth, Ford argues that the trial court erred by failing to instruct the jurors that to convict him of the R.C. 2929.04(A)(7) specifications, they had to agree unanimously on which of the two alternatives (principal offender or prior calculation and design) they found him guilty. The court erred by failing to provide such instructions. *See State v. Moore*, 81 Ohio St.3d 22, 40, 689 N.E.2d 1 (1998). Because the defense failed to object, however, Ford has forfeited all but plain error. *See State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 111. No plain error occurred, because the guilty verdict as to Count 4 indicated unanimous agreement that Ford committed the murder with prior calculation and design.

{¶ 350} Finally, Ford argues that the verdict forms did not instruct the jury that they could consider prior calculation and design only if they found that he was

not the principal offender. Ford did not raise an objection to the verdict forms and forfeited all but plain error. We find that no plain error occurred.

{¶ 351} Based on the foregoing, we reject proposition of law No. II.

*N. Readmission of Trial-Phase Evidence and Testimony*

{¶ 352} In proposition of law No. XIV, Ford argues that the trial court erred in readmitting trial-phase evidence and all the trial-phase testimony during mitigation.

{¶ 353} R.C. 2929.03(D)(1) provides that at the penalty stage of a capital proceeding, the jury shall consider, among other things, "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * * [and] hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing." *See State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 240; *State v. DePew*, 38 Ohio St.3d 275, 282-283, 528 N.E.2d 542 (1988).

{¶ 354} Ford asserts that the trial court erred in readmitting this evidence because none of it was relevant to the aggravating circumstances. He argues that the state was merely retrying guilt in the mitigation phase. He also argues that the prosecutor was trying to admit photographs showing blood so that the jury would focus on the gruesomeness of the crimes.

{¶ 355} The trial court readmitted only the evidence that it deemed relevant to the aggravating circumstances. The ring and watch recovered from the dumpster, the stocking cap with Ford's DNA on it, the gloves worn on the night of the murder, the photographs of the Schoberts' home, the photograph of the bloody envelope inside Margaret's purse, and the photograph of blood on the console of the car were relevant to the aggravated-robbery and aggravated-burglary specifications. The two photographs of Margaret's injuries and the autopsy reports and protocols for Margaret and Jeffrey were relevant to the course-of-conduct aggravating

circumstance. Accordingly, we find that the trial court did not abuse its discretion in readmitting this evidence, because the evidence bore some relevance to the nature and the circumstances surrounding the R.C. 2929.04(A)(5) course-of-conduct specification and the (A)(7) felony-murder specification. *See Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 189.

{¶ 356} The photographs of the hat and the gloves were unnecessarily cumulative and should not have been admitted. Similarly, the photographs of the Family Dollar store and dumpster where the ring and watch were found lack relevance and should not have been admitted. Nevertheless, we find that the readmission of this evidence was not prejudicial.

{¶ 357} Ford also argues that the trial court erred by readmitting all testimonial evidence, because the jury had no way to disregard evidence that did not relate to the aggravating circumstances. However, defense counsel did not object to the readmission of the trial testimony and thus forfeited all but plain error.

{¶ 358} Ford's primary complaint is that all testimonial evidence regarding the felonious assault of Chelsea was submitted for consideration. But the trial court's instructions on relevancy limited the jury's consideration of the trial-phase testimony to that testimony related to the aggravating circumstances and the mitigating factors. Thus, there was no room for the jury to consider any evidence concerning Chelsea's felonious assault.

{¶ 359} Ford also argues that Dr. Dean's testimony about the autopsies was not relevant to the aggravating circumstances. Even assuming that Dr. Dean's testimony should not have been considered, we hold that no plain error occurred.

{¶ 360} Viewing the mitigation-phase instructions as a whole, we conclude that the trial court adequately guided the jury's consideration of the testimony during mitigation. *See McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 253-254; *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 251.

**{¶ 361}** Based on the foregoing, we reject proposition of law No. XIV.

*O. Instructions on Mercy*

**{¶ 362}** In proposition of law No. XIX, Ford argues that the trial court erred by denying his request for an instruction on mercy. We have consistently rejected similar claims. *See Sowell,* 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, at ¶ 131; *State v. Lorraine*, 66 Ohio St.3d 414, 417-418, 613 N.E.2d 212 (1993). And contrary to Ford's claims, neither *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), nor *Kansas v. Carr*, __ U.S. __, 136 S.Ct. 633, 193 L.Ed.2d 535 (2016), holds that a defendant is entitled to an instruction on mercy. We reject proposition of law No. XIX.

*P. Prosecutorial Misconduct*

**{¶ 363}** In proposition of law No. XIII, Ford argues that the prosecutor committed misconduct by disparaging defense counsel during the trial-phase and mitigation-phase closing arguments. Except where noted, however, trial counsel failed to object and thus have forfeited all but plain error. *State v. Wade*, 53 Ohio St.2d 182, 373 N.E.2d 1244 (1978), paragraph one of the syllabus.

**{¶ 364}** The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Phillips*, 455 U.S. at 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

1. Trial-Phase Argument

**{¶ 365}** First, Ford contends that the prosecutor improperly argued: "And I guarantee you the defense will suggest to you at points in their argument that you should not consider someone because of their background and that you would not rely on those people in the most important of your affairs." Ford argues that the prosecutor was insinuating that the defense would try to get the jury to do things the law does not permit. It is improper to denigrate counsel in the jury's presence.

*Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, at ¶ 123. But counsel's argument was directed at defense counsel's anticipated argument about the state's witnesses, not defense counsel's insincerity or improper motives. No plain error occurred. *See Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 221.

{¶ 366} Second, Ford argues that the prosecutor attempted to disparage counsel during rebuttal by arguing: "One of the things I want to point out at the beginning of this thing is: Mr. Sinn has done what I consider to be, you know, the Jedi mind trick. It is, you know: Look over here, don't look at the evidence." But the defense had opened the door to these comments by arguing: "[T]here is a lot more to this case than what you think you know. I mean, the prosecutor packages it in such a way that it is just so clear that you don't look any further." Both parties have latitude in responding to arguments of opposing counsel and may be "colorful or creative." *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523 (1988). The prosecutor's comment about "the Jedi mind trick" was a creative response to defense counsel's argument and was not aimed at denigrating him. *State v. Smith*, 87 Ohio St.3d 424, 442-443, 721 N.E.2d 93 (2000). Thus, no plain error occurred.

{¶ 367} Third, Ford objects to the prosecutor's argument about a letter from Ford to Chelsea that was not admitted at trial:

> So what does Mr. Sinn do? Mr. Sinn came up here and told you: If you can't feel it, put your hands on it—if it is important, you should be able to put your hands on it, right?
>
> Why is he saying that? Because he knows that there are certain things that you can't put your hands on.
>
> * * *
>
> Mr. Sinn complains because we did not give you the letter that Detective Hitchings talked about that said "I love you to death"

in it. You can imagine that letter is probably just full of self-serving things the defendant said, and we didn't feel that that was important to our case.

If Mr. Sinn does, he has the letter, he has all the discovery in this case, he has all those things, he has all those interviews.

{¶ 368} The prosecutor's rebuttal was fair comment in the face of the defense's argument, "I didn't see a jail letter come into evidence. I don't know. You can look through 270 pieces of evidence." "And when a piece of evidence that comes by that's so big to you * * * dig through the box, find it. * * * If it is that important, hold it in your hands." The prosecutor's comments were directed at the evidence and not counsel.

{¶ 369} Fourth, Ford objects to the prosecutor's statement, "If Mr. Sinn has some additional evidence about Zach Keys, I will charge him, too." But the defense had raised the possibility that Zachary was at the murder scene, the prosecutor's comments were aimed at the evidence and not counsel, and nothing improper was said. The prosecutor's comments could also be characterized as the expression of personal opinion, but such comments are not improper if they are based on the evidence presented at trial. *Smith*, 87 Ohio St.3d at 443, 721 N.E.2d 93. That is what occurred here.

{¶ 370} Fifth, Ford contends that the prosecutor, over defense objection, disparaged counsel by arguing: "One of the other things I thought was really funny is—or interesting is, is that they said you don't know the rest of the story. I didn't hear anybody tell us the rest of the story." But the prosecutor's characterization of the defense argument as "really funny" was directed at the merits of the argument and not counsel. Thus, no error was committed. *See Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 221.

{¶ 371} Sixth, Ford contends that the prosecutor improperly argued: "The other thing is, he puts that—we call it planting a seed, right? He says, 'There is more to this case than you think you know.' What does that mean? It means nothing." These were fair comments in the face of the defense argument. Moreover, nothing in these remarks disparaged counsel.

{¶ 372} Finally, Ford contends that the prosecutor attacked defense counsel and not the evidence in arguing: "One of the things that I always, you know, think is interesting is how a defense approaches a case. And that's fine; they have the right to do that however they want." These comments implied that defense counsel's approach in defending Ford was insincere. *See LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 167 (the prosecutor improperly juxtaposed his "honest" case with the defense case and unfairly suggested that the defense's case was not honestly presented). Even so, we conclude that these were isolated comments that did not deny Ford a fair trial. Thus, no plain error occurred.

2. Mitigation-Phase Argument

{¶ 373} First, Ford objects to the prosecutor's argument about the value of mitigating evidence:

> Now, the past few days may have seemed to drag out longer than you thought they were, but these are the witnesses you heard:
>
> Kathleen Kovach. She is from the Ohio Parole Board. [Her] testimony is that individuals who receive sentences other than death and other than life without parole are eligible for parole at some time.
>
> Compare the value of that as a mitigating factor to the aggravating circumstances.

**{¶ 374}** Ford argues that this argument disparaged counsel for spending too long in presenting mitigation. However, the prosecutor's remarks about the length of mitigation cannot be reasonably construed as a criticism of defense counsel. Ford also contends that the prosecutor's request that the jury compare the "value" of mitigating evidence against the aggravating circumstances was improper, because the jury's role is to consider the "weight" of mitigating evidence. But nothing in this argument resulted in plain error.

**{¶ 375}** Second, Ford contends that the prosecutor's rebuttal disparaged how defense counsel argued the case by stating:

> [W]hat you just heard was not about the law, it wasn't about the facts, it wasn't about mitigation, it wasn't about aggravating circumstances. What you just heard is a plea.
>
> See, when you don't have the facts on your side, you pound the law. When you don't have the law on your side, you pound the facts. And when you got neither on your side, you beg and interject race. That's what you just heard.

**{¶ 376}** "A prosecutor can respond to issues raised by an accused." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 101. Here, in support of the defense counsel's impassioned plea for a life sentence for Ford rather than the death penalty, defense counsel argued the reasons why young black men like Ford never really have a fair chance. Ford's counsel was arguing that mitigating factors support a life sentence; the prosecutor argued that the aggravating factors support the imposition of the death penalty. While the prosecutor's remarks here are dismissive and reductive, they do not rise to the level of plain error.

**{¶ 377}** Third, Ford argues that the prosecutor committed misconduct during rebuttal argument by stating:

And then: These two are us.  You know, they always call us "the government."  And I always go home and tell my wife, "Hey, guess who you are sleeping with tonight, the government."

I am human.  Did you think I didn't feel bad when Mrs. Ford got up there and asked you to save her son's life?  Are you kidding me?  There wasn't a dry eye in here.

{¶ 378} The state concedes that the prosecutor's remarks were unnecessary but argues that they were just as likely an attempt at levity as a denigration of defense counsel.  These remarks about the defense argument were improper.  However, there is no reasonable basis to conclude that the result of the trial would have been different absent them.  *See Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 222.  No plain error occurred.

{¶ 379} Fourth, Ford objects to the prosecutor's comments about his mother's testimony: "How odd is it and ironic is it that the reason that [Mrs. Ford] is in here crying for you, begging to you, to save her son's life is because of what he did.  * * *  That's mitigating?  To me, that's cruel.  To make your mother do that, to put your mother through that because of what you did."  These comments, as inappropriate and maybe even as inaccurate as they may have been, were directed toward Ford, and not counsel.  But even if such remarks could be imputed to defense counsel, no plain error occurred.

{¶ 380} Fifth, Ford contends that the rebuttal argument disparaged counsel by saying: "I know Mr. Sinn would not intentionally do this, but he kept talking to you about the aggravating circumstances and, okay, Mr. Gessner [the prosecutor] had his hand up here when he said aggravating circumstances."  But this was a response to defense counsel's argument that the state would "talk to you about these

aggravating circumstances, and they keep putting their hands up real high, aggravating circumstances." None of these comments disparaged counsel.

{¶ 381} Sixth, Ford contends that the prosecutor's rebuttal disparaged counsel by stating: "He talks about hate. He is trying to appeal to your sympathies, trying to make you feel like bad people if you were to find the aggravating circumstances outweigh the mitigating factors. Please do not fall for that one." Ford also cites the prosecutor's claim that defense counsel was "implying somehow that if you do your job * * * that somehow you are a bad person, and make you feel guilty and bad for following the law. Please, do not do that." Again, both the prosecutor and defense counsel were attempting to persuade the jury to adopt their point of view about the appropriate punishment for Ford. Although the prosecutor's remarks here could be viewed as manipulative, they do not rise to the level of plain error. *See Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 253.

{¶ 382} Seventh, Ford argues that the prosecutor inappropriately argued: "And we are here to honor the law, not great speeches, racist speeches—or speeches about racism, speeches about slavery. * * * I mean, I can't imagine going back there after hearing that history of slavery in this country and not feeling a little awkward, maybe pandered to." This rebuttal was a response to defense counsel's arguments about racism. His remarks were directed at the merits of that argument and not counsel. No plain error occurred.

{¶ 383} Eighth, Ford asserts that the prosecutor disparaged counsel by arguing: "And I want to bring up another thing before I close here. They talk about his low IQ and they talk about his deficits. * * * I forget how he said it; it was really well done. He must have stayed up all night writing it." The state's sarcastic remarks, which were directed at counsel, were inappropriate and improper. The state concedes that the remarks were unnecessary but argues that they did not have any effect on the sentence. We agree. There is no reasonable basis to conclude that the sentence would have been different absent these comments, and no plain error

occurred. *See Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 222.

{¶ 384} As a final matter, Ford argues that the cumulative effect of the prosecutor's sarcastic and denigrating comments directed at defense counsel warrants reversal of the sentence.

{¶ 385} For a prosecutor's closing argument to be prejudicial, the remarks must be "so inflammatory as to render the jury's decision a product solely of passion and prejudice." *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986). To determine whether the remarks were prejudicial, we must review the closing argument in its entirety. *State v. Slagle*, 65 Ohio St.3d 597, 607, 605 N.E.2d 916 (1992); *State v. Moritz*, 63 Ohio St.2d 150, 157, 407 N.E.2d 1268 (1980). Thus, we must consider all of the prosecutor's remarks, irrespective of whether the defense preserved an objection. *Keenan*, 66 Ohio St.3d at 410, 613 N.E.2d 203 ("even though the defense waived objection to many remarks, those remarks still form part of the context in which we evaluate the effect on the jury of errors that were not waived").

{¶ 386} The prosecutor made inappropriate sarcastic remarks twice and also denigrated counsel on one other occasion. However, these were all relatively isolated remarks that did not pervade the prosecutor's overall mitigation argument. By comparison, in *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, we concluded that the prosecutor's closing remarks during the mitigation-phase argument were improper and "substantially prejudicial." *Id*. at ¶ 96. That prosecutor had invited the jury to consider what the victim experienced in the last moments of life, incited the jury's emotions through assertions that were not supported by the record, and argued that a sentence less than death was meaningless because he was already serving a life sentence. *Id*. at ¶ 82, 86-87.

{¶ 387} Similarly, in *Keenan*, 66 Ohio St.3d at 405-411, 613 N.E.2d 203, we held that the prosecutor's improper argument denied the defendant a fair trial.

There, the prosecutor improperly expressed his personal opinion about the defendant's guilt, denigrated counsel for making objections, consistently substituted emotion for reasoned advocacy, and attacked the character of the defendant's friends to attack him. *Id.*

{¶ 388} After reviewing the mitigation-phase closing argument in its entirety, we find that the prosecutors in *Kirkland* and *Keenan* committed far more serious and pervasive errors than the prosecutor made here. Thus, we hold that the prosecutor's closing remarks were not substantially prejudicial and did not deny Ford a fair trial.

{¶ 389} Based on the foregoing, we reject proposition of law No. XIII.

*Q. Ineffective Assistance of Counsel*

{¶ 390} In proposition of law No. XX, Ford raises various claims that his counsel provided ineffective assistance during both phases of the trial.

{¶ 391} Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and second, that the deficient performance prejudiced the defendant so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Accord State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

1. Failure to Follow up on Grand-Jury Motions

{¶ 392} Ford argues that trial counsel provided ineffective assistance by failing to follow up on three pretrial motions related to the grand jury: (1) a motion to disclose the names of grand-jury witnesses, (2) a request to transcribe the grand-jury testimony, and (3) a request for a pretrial copy of the grand-jury proceedings.

{¶ 393} At a hearing on November 26, 2013, the state objected to all three motions because the defense failed to show a "particularized need" for disclosure. Defense counsel responded that a relaxed standard for the release of grand-jury testimony should apply in capital cases. The trial court took the motions under

advisement. At a later hearing, on February 4, 2014, defense counsel argued for the disclosure of grand-jury witnesses and proceedings in every capital case. On September 24, 2014, the trial court ruled that the defense had failed to meet the "heavy burden" for "the disclosure of any of the Grand Jury materials referred to in those three motions; therefore, those motions will be overruled."

{¶ 394} We have recognized a limited exception to the general rule of grand-jury secrecy: an accused is not entitled to review the transcript of grand-jury proceedings "unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *State v. Greer*, 66 Ohio St.2d 139, 420 N.E.2d 982 (1981), paragraph two of the syllabus. A particularized need is established "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial." *State v. Sellards*, 17 Ohio St.3d 169, 173, 478 N.E.2d 781 (1985). Determining whether a particularized need exists is a matter within the trial court's discretion. *Greer* at paragraph one of the syllabus.

{¶ 395} First, Ford argues that defense counsel were negligent in failing to follow up on the grand-jury motions after the November 26, 2013 hearing. However, defense counsel did follow up on the motions on February 4, 2014. This preceded the trial court's ruling on the motions on September 24, 2014.

{¶ 396} Second, Ford argues that defense counsel were ineffective by failing to raise meritorious arguments in support of his motions. He contends that the defense needed the grand-jury testimony because the lay witnesses provided inconsistent statements. However, the mere possibility of inconsistent testimony does not rise to the level of a particularized need that would warrant the disclosure of grand-jury testimony. *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 44.

{¶ 397} Third, Ford asserts that the defense needed to know whether Detective Morrison testified before the grand jury, because he did not testify at trial,

and perhaps the defense would have called him as a witness if it had known what he had said before the grand jury. But Ford was required to show that nondisclosure of the grand-jury testimony would probably deprive him of a fair trial. Ford's speculative claim about Morrison fails to make such a showing. *See Lang* at ¶ 45.

{¶ 398} Finally, Ford argues that defense counsel should have argued that the defense was unable to establish a particularized need without knowing who testified before the grand jury. The same arguments have previously been rejected. *Id*. Accordingly, we conclude that these ineffectiveness claims lack merit.

2. Failure to Request Change of Venue

{¶ 399} Ford argues that defense counsel were ineffective by failing to request a change of venue. As an initial matter, it is unclear whether defense counsel filed a motion for change of venue. Nothing in the record shows that defense counsel actually filed such a motion. However, following the end of individual voir dire, the trial court stated that the defense motion for a change of venue was overruled.

{¶ 400} Regardless, Ford cannot show that he was prejudiced by defense counsel's alleged failure to file a motion for change of venue. Counsel may have reasonably decided as a matter of trial strategy to conduct the trial in Summit County. *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 234; *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 156, quoting *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 ("reviewing court 'will not second-guess trial strategy decisions' "). And the record does not show the pervasive publicity about which Ford complains.

{¶ 401} In addition, a change of venue is not automatically granted when there is pretrial publicity. Any decision to change venue rests largely within the discretion of the trial judge. *See White*, 82 Ohio St.3d at 25, 693 N.E.2d 772. Also, a "defendant claiming that pretrial publicity has denied him a fair trial must show

that one or more jurors were actually biased." *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 29.

{¶ 402} The jurors filled out questionnaires and were questioned about pretrial publicity. Seven of the seated jurors during deliberations had not been exposed to any media coverage about the case. One juror heard on TV that two people died, another saw a news report, and a third read about the violent death of a prominent couple in the newspaper. Of the remaining two jurors, one had heard that someone had broken into a home and killed people with a sledgehammer. The other remembered hearing that an older man coerced a younger man into committing the murders and that the older man had something to do with the victims' daughter. Moreover, all the jurors who knew about the case indicated that they could set aside their knowledge of the case and that the pretrial publicity would not affect their ability to be fair and impartial. *See Frazier* at ¶ 236. Thus, counsel could have reasonably decided not to request a change of venue. *See Bryan* at ¶ 156. Accordingly, we reject this ineffectiveness claim.

3. Failure to Question or Object to Jurors Exposed to Pretrial Publicity

{¶ 403} Ford argues that defense counsel failed to question or object to juror Nos. 39, 48, 72, or 78 about pretrial publicity.

{¶ 404} In general, "it is for [trial] counsel to determine what questions should be asked on voir dire." *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 139. "We have consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 63, quoting *Mason*, 82 Ohio St.3d at 157, 694 N.E.2d 932.

{¶ 405} Ford fails to explain what additional information defense counsel should have obtained from these prospective jurors or how defense counsel could have challenged these jurors. As discussed earlier, all the jurors who knew

something about the case assured the court that they could be fair and impartial. Thus, this claim lacks merit. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 50.

### 4. Failure to Exhaust Peremptory Challenges

{¶ 406} Ford argues that counsel were ineffective by failing to exercise all of his peremptory challenges.

{¶ 407} Decisions on the exercise of peremptory challenges are a part of trial strategy. *State v. Goodwin*, 84 Ohio St.3d 331, 341, 703 N.E.2d 1251 (1999). Trial counsel, who observe the jurors firsthand, are in a much better position to determine whether a prospective juror should be peremptorily challenged. *See Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 99.

{¶ 408} Ford argues that the defense should have used their last peremptory challenge against either juror No. 39 or No. 72 because they were automatic-death-penalty jurors. However, as discussed in proposition of law No. VI, nothing shows that either juror was biased or would automatically vote for the death penalty. Thus, Ford fails to show that defense counsel were deficient or that he was prejudiced by the failure to challenge these jurors. *See Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 264.

{¶ 409} Ford also contends that he was prejudiced because counsel's failure to exhaust Ford's peremptory challenges waived any objection to the trial court's denial of a challenge of a juror. *See Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 87. However, Ford has failed to establish that he was prejudiced by counsel's action. Thus, we reject this claim.

### 5. Praising the Victims

{¶ 410} Ford argues that counsel were ineffective by praising the victims' character. During opening statement, defense counsel reviewed the victims' background, stating that Jeffrey was a "well-known and highly regarded" attorney. Counsel added:

As the prosecution indicated, Attorney Schobert and his wife had been married for many, many years. They adopted two daughters. You know, there is a saying about children of adoption, that God blesses them because they get to choose those children. And by every measure, the Schoberts were remarkable parents and they chose their daughters.

     \* \* \*

The Schoberts were well-known in this community for their good works. Attorney Schobert mentored the Hoban mock trial team for years. He touched the lives of dozens of students.

     \* \* \*

\* \* \* [Mrs. Schobert] was the perfect counterpart to Mr. Schobert. And her dedication to her daughters, her love of this community, her work in various social organizations unparalleled.

{¶ 411} The defense can legitimately choose a strategy that is aimed at building rapport with the jury. *See Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 225; *Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, at ¶ 168-169. It is not clear why defense counsel chose to praise the Schoberts. However, it appears the defense was trying to establish credibility with the jury by demonstrating awareness of the jurors' likely concern for the victims' family. Ford fails to establish that he was prejudiced by these comments. Thus, we reject this ineffectiveness claim.

{¶ 412} Ford also argues that defense counsel improperly interjected victim-impact evidence during the cross-examination of Chelsea:

Q: So who tells you that your parents are dead? Detective King?

A: Yes.

Q: And at some point, that causes you a new—incredible amount of distress?

A: Yes.

The trial court then interrupted, stating, "It seems to me you have crossed a line into victim impact information when you ask her about the incredible amount of distress that she suffered as a result of her parents dying." Defense counsel replied, "Well, I guess I am just trying to establish what events took place after she found out her parents died." Although this cross-examination was of questionable relevance, Ford does not show that he was prejudiced by such remarks.

{¶ 413} Finally, Ford contends that defense counsel improperly mentioned victim-impact evidence before the trial court imposed sentence. Counsel stated, "The Schoberts were highly regarded in this community. Myself, throughout the course of this case, I've encountered people who knew the Schoberts. They would tell me about Mr. Schobert's intellect, his landscaping business when he was young." The trial court interrupted defense counsel and advised caution in discussing victim-impact information.

{¶ 414} "Absent an indication that the trial court considered the victim-impact evidence in arriving at its sentencing decision, the admission of such evidence is not reversible error. * * * [T]his court will presume that a trial court considered only the relevant, material, and competent evidence in arriving at its judgment, unless the contrary affirmatively appears from the record." *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 131. Nothing shows that the trial court considered defense counsel's statements about the victim's background in sentencing Ford to death. Accordingly, Ford fails to show

that he was prejudiced by defense counsel's improper argument. We reject this ineffectiveness claim.

### 6. Requesting Excusal of Juror No. 19

{¶ 415} Ford argues that trial counsel were ineffective by requesting the court to excuse juror No. 19 because she was a holdout juror.

{¶ 416} As discussed in proposition of law Nos. VIII and IX, the defense had unsuccessfully challenged juror No. 19 on two occasions: first, because she was a paralegal and had interned for the state, and second, because she attended the same church as Detective King. During the trial-phase deliberations, the parties learned that juror No. 19 was Facebook friends with several members of the prosecutor's office. Defense counsel requested that juror No. 19 be excused, and the trial court excused her. In an interview later published in the *Akron Beacon Journal*, juror No. 19 stated that she had changed her mind and was planning to remove her signature from the verdict convicting Ford of Jeffrey's murder when she was excused from the panel.

{¶ 417} The scrutiny of counsel's decision to request that juror No. 19 be excused requires that this court make "every effort * * * to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 418} In light of the prior defense challenges, defense counsel acted reasonably by requesting that juror No. 19 be excused after they learned that she was Facebook friends with the Summit County prosecutor and some of her staff. In making this decision, defense counsel could not have known that juror No. 19 was prepared to vote not guilty. Thus, viewed from counsel's perspective at the time, we conclude that counsel were not deficient in moving to excuse juror No. 19.

## 7. Presentence Investigation

**{¶ 419}** Ford argues that defense counsel were ineffective in requesting a presentence investigation ("PSI"). R.C. 2929.03(D)(1) provides that "[a] presentence investigation or mental examination shall not be made except upon request of the defendant. Copies of any reports prepared under this division *shall be furnished* to the court, to the trial jury if the defendant was tried by a jury, to the prosecutor, and to the offender or the offender's counsel for use under this division." (Emphasis added.)

**{¶ 420}** During mitigation-phase deliberations, the trial court mentioned that defense counsel had requested a PSI and mental-health examination pursuant to R.C. 2929.03(D)(1). The trial court raised the question whether the PSI and Dr. Stankowski's report, which was considered to be the mental-health report, should be provided to the jury.

**{¶ 421}** Defense counsel objected to the PSI because it was completed in haste and contained damaging information as to future dangerousness. Counsel added that they did not have an opportunity to talk with Ford before he spoke to the probation officer. Defense counsel requested to withdraw the PSI and wanted only Dr. Stankowski's report to be submitted. In the alternative, defense counsel asked "that neither go in." The trial court granted the defense request to withdraw the PSI.

**{¶ 422}** The state disputed that the PSI was completed in haste and argued that they would have called other witnesses if they had known that Dr. Stankowski's report would be provided to the jury. The trial court then decided, "I am going to follow the statute, and both documents will go to the jury." After a short recess, the trial court announced that "neither document will go to the jury."

{¶ 423} Defense counsel submitted a request for Dr. Stankowski's expert assistance pursuant to R.C. 2929.024.[8] Ford contends that if defense counsel had understood that Dr. Stankowski's assistance was requested under R.C. 2929.024, they could have gotten her report to the jury while avoiding the R.C. 2929.03(D)(1) requirement that the PSI also be submitted to the jury. But even so, Ford was not prejudiced by the failure to submit Dr. Stankowski's report to the jury, because she provided lengthy mitigation testimony that covered much of the same information contained in her report. Thus, we hold that this ineffectiveness claim lacks merit.

### 8. Deficiency in Raising Intellectual Disability

{¶ 424} Ford argues that defense counsel were ineffective in pursuing his intellectual-disability claim. However, it is unnecessary to review this claim, because we are remanding to the trial court for further review of Ford's intellectual-disability claim.

### 9. Other Ineffective-Assistance Allegations

{¶ 425} Ford raises other instances of alleged ineffectiveness of counsel. But as discussed in other propositions of law, even if counsel were deficient, no prejudice resulted. Ford has failed to establish that he was prejudiced by:

- counsel's failure to object to the trial court's and the prosecutor's voir dire misstatements and shorthand references to the weighing process (proposition of law No. V);

- counsel's isolated remarks referring to the aggravating circumstances as the "bad stuff";

- counsel's failure to more fully develop the issue of police coercion during his April 3, 2013 interview (proposition of law No. I);

---

8. R.C 2929.024 states: "If the court determines that the defendant is indigent and that investigation services, experts, or other services are reasonably necessary for the proper representation of a defendant charged with aggravated murder at trial or at the sentencing hearing, the court shall authorize the defendant's counsel to obtain the necessary services for the defendant * * *."

- counsel's failure to request an evidentiary hearing before he was ordered to be shackled (proposition of law No. XV);

- counsel's failure to apprise the trial court of Crim.R. 16(I) provisions during closing arguments (proposition of law No. XVI);

- counsel's failure to object to the verdict forms or the verdict that he killed Margaret with prior calculation and design (proposition of law No. II); and

- counsel's failure to object to the prosecutor's improper remarks during the trial-phase and mitigation-phase closing arguments (proposition of law No. XIII).

### 10. Cumulative Error

**{¶ 426}** Finally, Ford argues that defense counsel's cumulative errors and omissions violated his constitutional rights. However, because none of Ford's claims of ineffective assistance has merit, he cannot establish a right to relief by simply joining these claims together. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 173.

**{¶ 427}** Based on the foregoing, we reject proposition of law No. XX.

### *R. Sentencing Opinion*

**{¶ 428}** In proposition of law No. XVII, Ford argues that there are numerous errors in the trial court's sentencing opinion.

**{¶ 429}** R.C. 2929.03(F) sets forth the findings a trial court must make when imposing a death sentence. The statute requires that the court shall state the following in a separate opinion:

specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the

reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

{¶ 430} First, Ford argues that the trial court improperly referred to the R.C. 2929.04(A)(5) course-of-conduct specifications as the "multiple killing specifications." The trial court misspoke. However, the trial court had earlier correctly identified the R.C. 2929.04(A)(5) specifications as "a course of conduct involving the purposeful killing or attempt to kill two or more persons." Thus, the trial court did not misunderstand the meaning of those specifications.

{¶ 431} Second, Ford argues that the trial court improperly stated that he was found guilty of "Specifications Two and Three to Counts Four and Five, with the determination that he committed the aggravated murder of Margaret J. Schobert with prior calculation and design while committing * * * aggravated robbery." This was a misstatement, because Ford was found guilty of murder during an aggravated burglary in Specification 3. But this misstatement was harmless because the trial court correctly identified the specifications elsewhere in the opinion.

{¶ 432} Third, Ford discounts the trial court's statement that it did not consider a list of irrelevant evidence. Ford argues, "If he examined them, he was aware of them and it is hard to somehow wipe that evidence from his mind in making his determination. It is like unringing his own bell." However, Ford's claim overlooks that "a judge is presumed to be capable of separating what may be properly considered from what may not be considered." *In re Disqualification of Forsthoefel*, 135 Ohio St.3d 1316, 2013-Ohio-2292, 989 N.E.2d 62, ¶ 9. Ford presents nothing to overcome that presumption. Thus, we reject this claim.

{¶ 433} Fourth, Ford argues that the trial court improperly compared him with other family members by stating, "[M]any people grow up in circumstances

similar to Defendant Ford's and do not resort to criminal conduct. Indeed, his own sister and two step brothers, who grew up in almost the exact same environment are examples of how people from challenging backgrounds can live law abiding lives." However, such comparison was not improper. *See State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 101; *Campbell*, 90 Ohio St.3d at 343, 738 N.E.2d 1178.

**{¶ 434}** Fifth, Ford contends that the trial court improperly examined all the statutory mitigating factors even though the defense did not present evidence related to many of them. However, this claim overlooks the trial court's statement, "The court did not consider any mitigating factors under R.C. 2929.04 not raised by the defense (e.g., R.C. 2929.04(B)(1), (2), (5), or (6)) and has given no weight to the fact that the defense presented no evidence relating to those statutory factors." The trial court's disclaimer belies Ford's contention, and this claim is rejected.

**{¶ 435}** Sixth, Ford argues that the trial court improperly discounted Dr. Stankowski's testimony concerning Ford's drug and alcohol abuse. The trial court said that Dr. Stankowski's testimony supported her conclusion that Ford has an "alcohol use disorder" that contributed to his reckless or dangerous behavior. The trial court stated, "Apart from the impact of alcohol use on Defendant Ford's antisocial personality disorder, the court finds this factor to carry no weight. There was no evidence that Defendant Ford was under the influence of alcohol at the time of the murder of Margaret Schobert."

**{¶ 436}** The assessment and weight to be given to mitigating evidence are matters for the trial court's determination. *Hanna,* 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, at ¶ 103. The trial court could properly conclude that Ford's history of alcohol abuse was not entitled to any weight beyond that attributable to its impact on his antisocial personality disorder. However, the trial court improperly discounted Ford's alcohol use by assigning no weight to it as a mitigating factor simply because he was not under the influence of alcohol at the

time of Margaret's murder. The court's statement in that regard reflects an incorrect definition of mitigation, one that relates to culpability, as opposed to those factors that are relevant to whether the offender should be sentenced to death. *See State v. Goff*, 82 Ohio St.3d 123, 133-134, 694 N.E.2d 916 (1998); *State v. Holloway*, 38 Ohio St.2d 239, 527 N.E.2d 831 (1988), paragraph one of the syllabus (mitigation not about blame or culpability but rather about punishment).

{¶ 437} Seventh, Ford contends that the trial court improperly weighed the aggravating circumstances against the mitigating factors by considering him both the principal offender (i.e., the actual killer) and not the principal offender. The trial court, in weighing the aggravating circumstances against the mitigating factors, stated: "Ford purposely caused the death of Margaret J. Schobert as a part of a course of conduct involving the purposeful killing of two or more persons by the defendant. In this case, [Ford] was the actual killer * * *. Both people were killed when the defendant inflicted multiple sledgehammer blows to their heads." The trial court added: "The defendant also committed the Aggravated Murder of [Margaret] while committing or attempting to commit Aggravated Robbery and Aggravated Burglary. And he committed the Aggravated Murder with prior calculation and design." These conflicting findings were erroneous.

{¶ 438} Finally, Ford argues that the trial court erred by not giving weight to the R.C. 2929.04(B)(6) accomplice-only mitigating factor. The trial court noted that the defense presented no argument or mitigating evidence on this factor and did not request the jury to be instructed on it. Moreover, "[t]he weight, if any, given to a mitigating factor is a matter for the discretion of the individual decisionmaker." *State v. Filiaggi*, 86 Ohio St.3d 230, 245, 714 N.E.2d 867 (1999).

{¶ 439} Based on the foregoing, we hold that proposition of law No. XVII has merit. On remand, we direct the trial court to correct the misstatements that we have identified in its sentencing opinion.

*S. Cumulative Error*

**{¶ 440}** In proposition of law No. XXI, Ford argues that the cumulative errors during both phases of the proceedings deprived him of a fair trial and a reliable mitigation hearing. However, Ford was not prejudiced by any error at his trial. Thus, we reject this claim.

*T. Constitutionality*

**{¶ 441}** In proposition of law No. XXII, Ford argues that Ohio's capital-sentencing procedures violate the Sixth Amendment right to a jury trial as construed in *Hurst v. Florida*, __ U.S. __, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). We reject this argument on the authority of *State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, 108 N.E.3d 56, which rejected the same *Hurst* claim.

**{¶ 442}** In proposition of law No. XXIII, Ford challenges the constitutionality of Ohio's death-penalty statutes and claims that the statutes violate international law and treaties to which the United States is a party. We have previously rejected the same arguments. *See, e.g., Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 279-280.

*U. Appropriateness and Proportionality of the Death Sentence*

**{¶ 443}** In proposition of law No. XVIII, Ford argues that the death sentence is not an appropriate sentence because of his background, his low IQ score, and his youth at the time of the offenses. He also argues that his sentence is not proportional given similar cases in which the death penalty was imposed or could have been imposed. We will not consider these arguments at this time.

**V. Conclusion**

**{¶ 444}** We affirm Ford's convictions. However, we vacate the sentence and remand to the trial court to hold a new hearing to determine Ford's intellectual disability, *see Atkins*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, and prepare a new sentencing opinion as required by R.C. 2929.03(F), correcting the

misstatements that we have identified. The trial court shall also conduct whatever other proceedings are required by law and consistent with this opinion.

Judgment affirmed in part
and vacated in part,
and cause remanded.

O'CONNOR, C.J., and FRENCH, FISCHER, and DONNELLY, JJ., concur.

DEWINE, J., concurs in part and dissents in part, with an opinion joined by KENNEDY, J.

_____

**DEWINE, J., concurring in part and dissenting in part.**

{¶ 445} I would affirm the trial court's judgment in full. The burden was on Shawn Ford to show that he is intellectually disabled. He came nowhere near meeting his burden—in fact the evidence strongly supports the conclusion that he is not intellectually disabled. Therefore, I respectfully dissent from the majority's judgment remanding the case for a new hearing under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

{¶ 446} The majority takes issue with the trial court's application of the rule that this court laid down in *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011. Relying on the United States Supreme Court's recent decision in *Moore v. Texas*, the majority concludes that *Lott* is no longer good law in light of current psychological diagnostic standards. *See Moore*, __ U.S. __, 137 S.Ct. 1039, 1045, 197 L.Ed.2d 416 (2017). Thus, the majority holds, Ford is entitled to a new hearing to determine whether he is intellectually disabled under those current standards. The problem is that the evidence adduced at the *Atkins* hearing that was already held shows that even under the most current diagnostic standards, Ford came nowhere near meeting his burden to show that he is intellectually disabled. Indeed, all three experts asked to opine on the matter concluded that Ford is not intellectually disabled.

123

{¶ 447} In *Lott,* this court confronted the task of applying the *Atkins* prohibition against the execution of intellectually disabled defendants. In addition to adopting clinical definitions of mental retardation (now intellectual disability), the court held that the burden fell on the defendant to prove by a preponderance of the evidence that he is intellectually disabled. *Lott* at ¶ 11-12, 21. While the majority opinion takes issue—perhaps justifiably—with the test stated in *Lott* for determining whether a person is intellectually disabled, there has been no suggestion that the defendant's burden should change. And here, there is no question that Ford did not meet that burden.

{¶ 448} Ford's own expert, Dr. Karpawich, was hamstrung in his ability to evaluate whether Ford is intellectually disabled because Ford refused to be interviewed by him. Nevertheless, using the resources available to him, Dr. Karpawich noted that Ford "has been evaluated on many prior occasions by educational professionals and psychologists, and he has never been given the diagnoses of mental retardation/intellectual disability." And Dr. Karpawich concluded that "[b]ased upon the available information, it is my opinion, with reasonable scientific certainty, that there is insufficient information to conclude that the defendant fulfills the criteria for mental retardation/intellectual disability." At the *Atkins* hearing, Ford did not challenge his expert's opinion or argue that an incorrect standard was used.

{¶ 449} Dr. Karpawich's opinion was echoed by the state's expert, Dr. Sylvia O'Bradovich, and the court's expert, Dr. Katie Connell. And again, Ford did not challenge their conclusions. It's not surprising, then, that the trial court found that Ford had not met his burden to prove he has an intellectual disability.

{¶ 450} Nevertheless, the majority adopts Ford's arguments and concludes that he should be given a new hearing because the rule we laid out in *Lott* does not apply current diagnostic standards. Specifically, the majority reasons that the trial court erred when it didn't take into account the standard error of measurement

("SEM") in assessing Ford's IQ scores and when it applied *Lott*'s requirement that a defendant show deficits in two areas of adaptive behavior. While there is room for improving the test laid out in *Lott* to adjust for changes in diagnostic standards, the evidence before the court reflected the experts' application of the current standards. Thus, any problem with the *Lott* test was not prejudicial to Ford.

### Intellectual Functioning

{¶ 451} In *Lott*, this court held that there was a rebuttable presumption that a defendant was not intellectually disabled if his IQ was over 70. *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12. The majority correctly notes that in *Hall v. Florida* the Supreme Court explained that "an individual's intellectual functioning cannot be reduced to a single numerical score." *Hall v. Florida*, 572 U.S. 701, 713, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014); *accord Moore v. Texas*, __ U.S. __, 137 S.Ct. 1039, 1050, 197 L.Ed.2d 416 (2017). Rather, "the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score." *Hall* at 713. *Hall* requires that a defendant facing the death penalty be able to present other evidence of intellectual disability, including evidence of "deficits in adaptive functioning," when IQ test results place the defendant within a statistical range that could indicate intellectual disability. *See id*. at 724. Nothing about the trial-court decision below is at odds with *Hall*. Indeed, after carefully considering the various IQ test results and expert testimony about each, the court looked to other evidence of intellectual disability, including Ford's adaptive functioning.

{¶ 452} Nevertheless, the majority concludes that the trial court erred in disregarding the SEM and failing to consider that the lower end of the SEM range could include an IQ score below 70. But the court didn't disregard the lower end. Instead, it concluded that Ford hadn't met his burden of proving he has significantly subaverage intellectual functioning. And there is overwhelming support for this finding in the record. Three out of six of Ford's IQ scores, even taking the SEM

into account, land above 70. And two of the tests that fell below that level were uniformly discounted by all three experts on grounds that they underestimated his actual intelligence. That leaves just one test, fixed on by the majority, which established an IQ range of 69-83. But any support for Ford's claim provided by that test is substantially outweighed by the other tests and by the unanimous view of all three experts who testified that Ford is not intellectually disabled.

{¶ 453} Even though the IQ tests, when viewed together, support the conclusion that Ford is not intellectually disabled, the trial court also considered Ford's adaptive functioning. It is thus unclear what the majority finds lacking in the trial court's assessment. The majority accuses the trial court of "disregarding the SEM," majority opinion at ¶ 84. But under *Moore*, the relevance of looking to the SEM is that when the lower end of the SEM falls in the intellectually disabled range, a court should also consider adaptive functioning. *See Moore* at __, 137 S.Ct. at 1049. That's precisely what the trial court and all three experts did.

## Adaptive Functioning

{¶ 454} Based on the diagnostic standards in place at the time, *Lott* held that to prove intellectual disability, a defendant must show "significant limitations in two or more adaptive skills." *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12. Current diagnostic standards instead ask whether there are significant deficits in any of three adaptive skill sets. *See Moore* at __, 137 S.Ct. at 1046. The majority relies on *Moore* to find that the trial court erred in applying the older standards set forth in *Lott*. But *Moore* involved a much different fact pattern.

{¶ 455} In *Moore*, the Texas court not only adhered to old standards, despite evidence that the defendant had an intellectual disability as defined under the new standards, but also refused to account for SEM in considering the defendant's IQ score. *See Moore* at __, 137 S.Ct. at 1050. More troublingly, the court balanced adaptive deficits with what it considered strengths and used evidentiary factors not supported by clinical studies. *Id.*

{¶ 456} Ford's case differs considerably. First, unlike in *Moore*, there is no suggestion that Ford would be found intellectually disabled were new standards used. Further, both the state expert and the court expert—the only experts given an opportunity to talk with Ford—applied current psychological standards. Dr. O'Bradovich's adaptive-behavior evaluation considered Ford's communication, daily-living, and socialization skills and concluded that the results were "not indicative of significant deficits in adaptive functioning." Dr. Connell explicitly used the current DSM-5 and AAIDD-11 standards cited in *Moore*. Applying these standards, Dr. Connell concluded that the available evidence did not support deficits due to intellectual disability in any of three adaptive behavior areas— conceptual, social, or practical. And while Ford's expert, Dr. Karpawich, did not personally interview Ford, he assessed Ford's adaptive functioning using available resources, and did not conclude that Ford is intellectually disabled. Simply put, Ford came nowhere near showing by a preponderance of the evidence that under either set of standards, he is intellectually disabled.

{¶ 457} That isn't to say *Lott* wouldn't benefit from a reworking. There are problems inherent in incorporating current psychological standards into a test that will be used for years to come. A better rule would tie the assessment to contemporary standards, requiring demonstration of the following: (1) significantly subaverage intellectual function (making clear that SEM must be considered), (2) significant deficit in adaptive functioning, as defined by psychological standards in place at the time of the evaluation, and (3) onset before age 18. Such an adjustment in *Lott*'s rule would recognize the importance of looking to the expertise of medical professionals, as noted in *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 18, and *Hall*, 572 U.S. at 721, 134 S.Ct. 1986, 188 L.Ed. 1007.

**The Flynn Effect**

{¶ 458} The majority also instructs the trial court to at least discuss the "Flynn Effect" even though it notes that the trial court has discretion in deciding

whether to apply it. The Flynn Effect arises out of the fact that IQ scores are normed based on comparisons to the general population. Since the general population is getting more intelligent over time—at least in ways measured by IQ tests—this means that what would have been average intelligence 100 years ago (receiving an IQ score of approximately 100) would be at the bottom end of the distribution now (receiving an IQ score of approximately 70). *See Black v. Carpenter*, 866 F.3d 734, 749 (6th Cir.2017).

{¶ 459} The relevance of the Flynn Effect to the determination of intellectual disability in capital cases has never been addressed by the U.S. Supreme Court. But some have argued that taking the Flynn Effect into account can eliminate a degree of arbitrariness in IQ scores depending on when an IQ test was taken and when it was normed. As Dr. Flynn himself has explained, if two defendants of the same intelligence were tested using different tests, of which one was normed 25 years earlier and another was normed more recently, the first might show an IQ score above 70 and face the death penalty, while the latter might show a score below 70 and not. *See* James R. Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 Psychol.Pub.Pol'y & L. 170, 174 (2006). But this merely underscores the importance of *Hall*'s reminder that rigid reliance on IQ scores alone should be resisted. *Hall* at 724; *see also* Bonnie & Gustafson, *The Challenge of Implementing* Atkins v. Virginia*: How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases*, 41 U.Rich.L.Rev. 811, 841-845 (2007).

{¶ 460} In this case, I would not remand for the trial court to assess the relevance of the Flynn Effect, because applying the Flynn Effect doesn't change the analysis. As Dr. Connell opined, the Flynn Effect would meaningfully affect only one of the IQ tests, yielding a modified IQ score of 72. The relevance of the Flynn Effect, then, is just that it might trigger a more searching look at adaptive functioning, as required by *Hall* and *Moore*. But the trial court in this case already

engaged in that more searching inquiry, with the aid of three experts, all of whom concluded that Ford is not intellectually disabled.

### Conclusion

{¶ 461} Here, the trial court's findings were informed by the view of medical experts, all of whom carefully looked at both Ford's IQ scores and his adaptive functioning. Every expert opined that Ford does not have an intellectual disability. To remand this case in the face of such strong evidence is simply wrong as a matter of law. For that reason, I respectfully dissent.

KENNEDY, J., concurs in the foregoing opinion.

————————————

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Heaven R. DiMartino and Jacquenette S. Corgan, Assistant Prosecuting Attorneys, for appellee.

Maro and Schoenike Company and Lynn A. Maro; and John B. Juhasz, for appellant.

Dave Yost, Attorney General, Benjamin M. Flowers, State Solicitor, and M. Ryan Harmanis and Thomas E. Madden, Assistant Attorneys General, for amicus curiae, Ohio Attorney General.

————————————